841 F.2d 92
 Bankr. L. Rep. P 72,245, 9 Employee Benefits Ca 1853
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
Plaintiff- Appellant,
v.
CENTRAL TRANSPORT, INC.; George E. Gilbertson, Trustee;
Mason and Dixon Lines, Inc., Defendant-Appellee,
Official Unsecured Creditors' Committee of the Mason and
Dixon Lines, Incorporated, Intervenor.
 No. 86-2100.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 6, 1987.
Decided March 8, 1988.
 
 Elizabeth Roberto (Russell N. Luplow, Bloomfield Hills, Mich., Herbert S. Falk, Jr., Falk, Carruthers & Roth, P.A., Greensboro, N.C., on brief), for plaintiff-appellant.
 Patrick A. Moran, Birmingham, Mich., (Michael A. Nedelman, Birmingham, Mich., on brief), for Cent. Transport, Inc.
 William L. Stocks (Nichols, Caffrey, Hill, Evans & Murrelle, Greensboro, N.C., on brief), for Mason & Dixon Lines, Inc.
 R. Bradford Leggett, Catherine R. Carruthers (Allman, Spry, Humphreys, Leggett & Howington, P.A., Winston Salem, N.C., on brief), for George E. Gilbertson.
 John E. Young (Fitzgerald, Young, Peters, Dakmak & Bruon, Detroit, Mich., on brief), for Mason & Dixon Lines, Inc.
 Before CHAPMAN and WILKINS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 HAYNSWORTH, Senior Circuit Judge:
 
 
 1
 Some controversies are not amenable to judicial resolution, and some grow beyond the remedial powers of a court. This is particularly true when a party, seeking a return to the status quo ante, sits idly by and permits intervening events to extinguish old rights and create new ones. This is such a case. The appellant, a multi-employer pension plan, seeks to have the court overturn the confirmation of a plan for reorganization in bankruptcy of Mason & Dixon Lines, Inc., a multi-state trucking company. The bankruptcy court granted the pension plan's motion for a stay of the confirmation order conditioned upon the pension plan's posting of a supersedeas bond. In re The Mason & Dixon Lines Inc., 63 B.R. 176 (Bankr.M.D.N.C.1986). The pension plan chose not to post the supersedeas bond and permitted the reorganization plan to be largely consummated and effected.
 
 
 2
 The district court found that the pension plan's appeal had become moot by reason of the substantial implementation of the reorganization plan. 68 B.R. 95 (M.D.N.C.1986). We, too, agree that the appeal is moot, presenting only an academic question, for, though the pension plan's objections be sustained, the court cannot equitably provide any remedy.
 
 I.
 
 3
 Mason & Dixon Lines, Inc. was a multi-state common carrier by motor vehicle. After suffering severe financial losses in 1982 and 1983, Mason & Dixon Lines, Inc. sought protection from its creditors under Chapter 11 of the Bankruptcy Act. It was continued as debtor in possession until December 1984, when control was transferred to George E. Gilbertson as trustee.
 
 
 4
 Central States, Southeast and Southwest Areas Pension Fund is a multi-employer pension fund within the meaning of Sec. 3(37) of ERISA. 29 U.S.C.A. Sec. 1002(37) (West Supp.1987). Through the collective bargaining process, it became the funder of retirement benefits for employees of Mason & Dixon Lines and those of other employers. Under the Multi-Employer Pension Plan Amendments Act of 1980, 29 U.S.C.A. Secs. 1381-1405 (West 1985), a pension fund is required to assess and collect a "withdrawal liability fee" to cover unfunded liabilities whenever an employer withdraws from a plan, and a partial withdrawal may suffice to trigger the employer's duty to pay a withdrawal liability fee.
 
 
 5
 A union representing employees of Mason & Dixon Tank Lines, a subsidiary of Mason & Dixon Lines, was decertified. The Pension Fund took the position that the union decertification of the collective bargaining representative of the employees of the subsidiary triggered Mason & Dixon Lines withdrawal liability, but its estimate of the withdrawal liability was based upon an anticipated overall reduction in the number of covered jobs of the parent and its subsidiary. The Pension Fund asserted a withdrawal liability fee of approximately $26 million, which later was scaled down to $17 million. A claim for that amount was filed in the bankruptcy court as an unsecured claim without priority.
 
 II.
 
 6
 After several proposed plans of reorganization were rejected, Central Transport, Mason & Dixon's principal stockholder, and the trustee, jointly submitted a "Restated Joint Plan of Reorganization." That plan provided for the cancellation of all of Mason & Dixon's outstanding common stock, an issue of new common stock to CenTra, Inc., an affiliate of Central Transport, in exchange for a capital contribution of $1 million. The plan provided for the issuance of new preferred stock to all unsecured creditors, each creditor receiving preferred stock having a par value equal to the amount of the unsecured claim. The unsecured creditors, however, were divided into two classes. Class 7 consisted of pension plans having withdrawal liability claims while Class 6 consisted of all other unsecured creditors. The Class B preferred stock distributable to the creditors in Classes 6 and 7 was identical, except that the preferred stock distributable to unsecured creditors in Class 6 was designated as Series 1 while that distributable to creditors in Class 7 was designated as Series 2.
 
 
 7
 There was a liquidation preference for the preferred stock, and there was a provision for its mandatory redemption 20 years after issuance. During the 20 years, however, no dividends were payable on the preferred stock, and the preferred stockholders had no voting rights.
 
 
 8
 Before the restated joint plan was submitted to the creditors, the R-100 Corp., not a party to this action, submitted a written offer to purchase the Series 1 preferred stock at 10 percent of its stated value. The offer was limited to no more than $20 million of stated value of the Series 1 stock, though the total claims in Class 6 aggregated only approximately $12 million.
 
 
 9
 R-100 Corp.'s offer was mailed to the creditors in a package containing the proposed plan of reorganization, a voting ballot, a copy of the Amended Joint Disclosure Statement, and other materials. The offer was also disclosed in the Disclosure Statement.
 
 
 10
 The proponents of the plan of reorganization, Central Transport and the trustee, insist that R-100 Corp.'s offer is not a part of the plan of reorganization, but the Pension Fund asserts that, as a practical matter, the offer has always been treated as an integral part of the plan. A copy of the offer was mailed to the unsecured creditors with the disclosure materials and a ballot to be used in voting. R-100 Corp. made the offer on behalf of undisclosed principals. The pension plan suggests that those undisclosed principals are affiliates of Central Transport. R-100 Corp.'s offer was signed by Norman E. Harned, who gave his title as Vice President of R-100 Corp. He is the Vice President of Finance for Central Transport, and the Pension Fund suggests that insiders at Central Transport control R-100 Corp. and initiated the offer.
 
 
 11
 R-100 Corp.'s offer provides some inducement to the Class 6 creditors to vote for the plan's approval, and the district court found that the approval of the plan by the Class 6 creditors was "at least partially based upon" the existence of the offer.
 
 
 12
 The Official Unsecured Creditors Committee endorsed the plan, but each of the six pension funds in Class 7 voted against it. Only the Central States fund appeared at the confirmation hearing in opposition to the plan, but it objected and contended that the existence of R-100 Corp.'s offer subjected the Class 7 claims to inequitable and disparate treatment. The existence of the offer meant that creditors in Class 6 could obtain prompt payment of 10 percent of their claims, while Class 7 creditors would be required to wait 20 years for redemption. Meanwhile, the Class 7 creditors would receive no dividend on the preferred stock, and the principal amount would be at risk of loss through insolvency.
 
 III.
 
 13
 The order confirming the plan of reorganization was issued on March 29, 1986. The order was stayed conditioned upon the Pension Fund posting a $7 million supersedeas bond. The Pension Fund did not post the supersedeas bond, and took no steps to secure a reduction in its amount. While it sought review by the district court of the confirmation order itself, it did nothing to delay or postpone implementation of the confirmed plan of reorganization. Implementation of the plan properly began on April 9, 1986.
 
 
 14
 By the time the appeal was heard by the district court on June 30, 1986, all of Mason & Dixon's outstanding stock had been cancelled. New common stock had been issued to CenTra, Inc. in exchange for $1 million. A $12 million line of credit from GLS LeasCo had been activated, and $5,715,000 had been drawn down for use in discharging the superpriority indebtedness owed to GLS LeasCo. Over $507,000 had been disbursed for administrative expenses and professional fees, while $622,000 had been used to discharge priority wage claims. Mason & Dixon's Charter and Bylaws had been amended, and Class A and Class B preferred stock had been issued. The trustee had relinquished control to the new officers and directors, and the reorganized enterprise was a going concern.
 
 
 15
 Some of the steps taken before June 30, 1986, in implementation of the plan might have been undone, but CenTra had been allowed to put up its $1 million, and very substantial disbursements of money had been made to persons who are not parties to this proceeding.
 
 
 16
 We can understand a reluctance to put up a supersedeas bond of $7 million, but if the Pension Fund seriously sought an outright reversal of the order of confirmation, as it contends, it should have posted the bond or sought a substantial reduction in its amount; it should not have sat idly by while this case drifted along a routine, unexpedited course.
 
 IV.
 
 17
 When there is no longer a case or controversy in the constitutional sense, an Article III court is without jurisdiction to adjudicate. Short of that, a case may become moot under "a melange of doctrines relating to the court's discretion in matters of remedy and judicial administration." Chamber of Commerce v. United States Dep't of Energy, 627 F.2d 289, 291 (D.C. Cir.1980). The principle was stated years ago by the United States Supreme Court in Mills v. Green, 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895), in which it was declared that when, pending appeal, an event occurs, without the fault of the defendant, that makes it impossible for the court to grant effective relief to the plaintiff, should the plaintiff prevail on the merits, the appeal should be dismissed and the court should not proceed to judgment. It is the duty of a court to render a judgment in an actual controversy within its jurisdiction and in the presence of proper parties, but a court should not render an opinion in a dispute if the court is without the power to afford effective relief. In re Combined Metals Reduction Co., 557 F.2d 179, 187 (9th Cir.1977).
 
 
 18
 Orders confirming plans of reorganization do not become immune from appellate review upon their partial, or even substantial, implementation. In re AOV Indus., Inc., 792 F.2d 1140, 1148-50 (D.C. Cir.1986); In re King Resources Co., 651 F.2d 1326, 1332 (10th Cir.1980). On the other hand, dismissal of the appeal on mootness grounds is required when implementation of the plan has created, extinguished or modified rights, particularly of persons not before the court, to such an extent that effective judicial relief is no longer practically available. See, e.g., In re National Homeowners Sales Serv. Corp., 554 F.2d 636, 637 (4th Cir.1977); In re Abingdon Realty Corp., 530 F.2d 588, 590 (4th Cir.1976); see also In re Roberts Farms, Inc., 652 F.2d 793, 796-98 (9th Cir.1981); In re Information Dialogues, Inc., 662 F.2d 475, 476 (8th Cir.1981). The court should reach a determination upon close consideration of the relief sought in light of the facts of the particular case.
 
 
 19
 The primary relief sought by the Pension Fund is a complete reversal of the plan of reorganization. That, of course, would require the undoing of financial transactions involving third parties, not participants in this litigation. As the court in Roberts Farms observed, that would only "create an unmanageable, uncontrollable situation for the Bankruptcy Court." 652 F.2d at 797.
 
 
 20
 The Pension Fund suggests that more limited relief might be appropriate. It suggests that there might be a modification of the plan to give the Class 7 creditors Series 1 preferred stock and thus within R-100's purchase offer. That, however, would require the Class 6 creditors to surrender their advantage, at least on a pro rata basis, or a modification of R-100 Corp.'s offer to encompass stock having a face value of at least $29 million, or more if the other pension fund claimants are included. Neither R-100 Corp. nor the Class 6 creditors are parties, and we were informed at the time of oral argument that the offer of R-100 Corp. had expired by its terms. At the time of oral argument, there was no current preferred stock purchase offer with which the court might deal.
 
 
 21
 Modification of the plan of reorganization along the lines suggested is possible only if all parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings. See Abingdon Realty, 530 F.2d at 590; AOV Indus., 792 F.2d at 1149; In re Royal Properties, Inc., 621 F.2d 984, 987 (9th Cir.1980). The Pension Fund made no attempt to bring the Class 6 creditors or R-100 Corp. into these proceedings. We are without jurisdiction to impose substantial adverse consequences upon those absent persons. An extension of the purchase offer of R-100 Corp. to include the claims of the Class 7 creditors, under the circumstances, is beyond the power of the court.
 
 
 22
 The district court properly dismissed the appeal as moot.
 
 
 23
 APPEAL DISMISSED.