In re PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, Debtor.

Martin ROCHMAN, et al., Appellants,

v.

NORTHEAST UTILITIES SERVICE GROUP, et al., Appellees.

No. 91–2039.

United States Court of Appeals, First Circuit.

Heard Feb. 4, 1992.

Decided May 6, 1992.

Robert C. Richards, for appellants.

John B. Nolan with whom Allan B. Taylor, Lorenzo Mendizabal, Theodore C. Morris, Day, Berry & Howard, Hartford, Conn., Geoffrey M. Kalmus, Kramer, Levin, Nessen, Kamin & Frankel, Howard J. Berman, and Whitman & Ranson, New York City, were on brief, for appellees.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Three shareholders of Public Service Company of New Hampshire contend on appeal that the order confirming the Public Service Company of New Hampshire (hereinafter "PSNH") chapter 11 reorganization

plan represents an abuse of discretion and violates their constitutional right to just compensation under the Fifth and Fourteenth Amendments to the United States Constitution. As the appeal from the district court judgment affirming the order of confirmation must be dismissed for mootness, we do not reach the merits of their appellate claims.

## I
## BACKGROUND[1]

PSNH filed its chapter 11 petition in the United States Bankruptcy Court for the District of New Hampshire on January 28, 1988, seeking relief from the severe financial difficulties it encountered as the principal owner of the controversial nuclear power facility under construction at Seabrook, New Hampshire, since 1972. Due to the fact that the State of New Hampshire had banned Seabrook construction cost recoveries through PSNH rate increases until after the facility was brought on line, *see* N.H.Rev.Stat.Ann. § 378:30-a, PSNH had been forced to borrow the huge sums required to complete construction of the Seabrook facility. Meanwhile, construction delays, and problems in obtaining operating authority from the Nuclear Regulatory Commission, had escalated construction costs to $6.5 billion by January 1, 1990, $2.9 billion having been invested by PSNH which then owned a 35.6 percent share in Seabrook. Consequently, even though one Seabrook unit had been completed by October 1986, PSNH was forced to seek chapter 11 protection prior to the completion of the second unit.

During November 1989, Northeast Utilities Service Company (hereinafter "NUSC")[2] entered into an agreement with the Governor and Attorney General of New Hampshire for the establishment of an electricity rate structure which would allow PSNH to raise retail customer rates by 5.5% in each of seven successive years and enable PSNH to recoup some, but not all, of its Seabrook investment. On December 18, 1989, the New Hampshire Legislature empowered the New Hampshire Public Utilities Commission ("NHPUC") "to determine whether implementation of the [rate] agreement would be consistent with the public good." N.H.Rev.Stat.Ann. § 362-C:3 (Supp.1990). The NHPUC approved the rate agreement on July 20, 1990. *Re Northeast Utilities/Public Service Company of New Hampshire*, 114 PUR 4th 385 (N.H.P.U.C.1990). The NHPUC order was affirmed by the Supreme Court of New Hampshire on April 24, 1991. *Appeal of Richards*, 134 N.H. 148, 590 A.2d 586, *cert. denied*, — U.S. —, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991).

Appellants objected to confirmation of the reorganization plan on the grounds that the approved rate agreement on which the reorganization was based would deprive PSNH of its prudent investment in Seabrook and that the proposed reorganization therefore was not in the best interests of appellants, as equity interest holders, since a litigated rate case allegedly would provide a greater return. The bankruptcy court conducted a six-day confirmation hearing, during which proponents of the reorganization plan presented several expert witnesses, who were cross-examined by appellants. Appellant Robert Richards testified in opposition to confirmation.

On April 20, 1990, Bankruptcy Judge James A. Yacos entered the order of confirmation, accompanied by a comprehensive and well-reasoned memorandum opinion overruling appellants' objections. *See In re Public Service Co.*, 114 B.R. 820 (Bankr. D.N.H.1990). Judge Yacos found the reorganization plan "fair and equitable," *see* Bankruptcy Code § 1129(b)(1) & (2), 11 U.S.C. § 1129(b)(1) & (2), since the rate agreement was within the range of results reasonably expectable in a litigated rate case. Judge Yacos further found that the class of common stock holders to which appellants belong would realize no greater

---

**1.** We summarize the background to the extended reorganization proceedings conducted in the bankruptcy court and invite reference to the opinions cited below for further detail.

**2.** NUSC is a wholly-owned subsidiary of Northeast Utility, a public utility holding company. The PSNH reorganization plan calls for the eventual merger of reorganized PSNH with NUSC and Northeast Utility.

recovery in a litigated rate case and, therefore, that the reorganization plan met the requirements of Bankruptcy Code § 1129(a)(7)(A)(ii).[3] Appellants filed a motion to stay execution of the confirmation order pending appeal, which was denied by the bankruptcy judge after hearing. *See In re Public Service Co.*, 116 B.R. 347 (Bankr.D.N.H.1990). No appeal was taken from the order denying the stay.

Appellants filed a notice of appeal from the order of confirmation with the United States District Court on May 18, 1990. Appellants' motion to stay execution of the confirmation order pending appeal was rejected by the district court on July 23, 1990. Once again, no appeal was taken. More than six months later, on February 8, 1991, appellants again moved for a stay in the district court, which was never acted on. During early August 1991, appellants requested a writ of mandamus to compel the district court to act on the merits of their appeal. The court of appeals dismissed the mandamus petition as moot. On August 21, 1991, the district court affirmed the order of confirmation entered by the bankruptcy court on April 20, 1990.

## II

## DISCUSSION

■ Mootness in bankruptcy appellate proceedings, as elsewhere, is premised on jurisdictional and equitable considerations stemming from the impracticability of fashioning fair and effective judicial relief. *See, e.g., In re Stadium Management Corp.*, 895 F.2d 845, 847 (1st Cir.1990); *In re AOV Industries, Inc.*, 792 F.2d 1140, 1147–48 (D.C.Cir.1986), *vacated in part on other grounds*, 797 F.2d 1004 (D.C.Cir. 1986) (mootness involves "constitutional" and "equitable" aspects); *In re Texaco, Inc.*, 92 B.R. 38, 45 (S.D.N.Y.1988) (same). Jurisdictional concerns may arise from the constitutional limitations imposed on the exercise of Article III judicial power in circumstances where no effective remedy can be provided,[4] or from a loss of jurisdiction over the *res* or the parties, before or during the appeal, which renders the appellate court powerless to grant the requested relief.[5]

The equitable component to the mootness doctrine is rooted in the "court's discretion in matters of remedy and judicial administration" not to determine a case on its merits. *In re AOV*, 792 F.2d at 1147 (quoting *Chamber of Commerce v. United States Dep't of Energy*, 627 F.2d 289, 291 (D.C.Cir.1980)); *In re Texaco*, 92 B.R. at 45 (same). In bankruptcy proceedings, the equitable component centers on the important public policy favoring orderly reorganization and settlement of debtor estates by

**3.** Bankruptcy Code § 1129(a)(7)(A)(ii) provides—

(a) The court shall confirm a plan only if all of the following requirements are met:
....
(7) With respect to each impaired class of claims or interests—
(A) each holder of a claim or interest of such class—
....
(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of this title on such date.
11 U.S.C. § 1129(a)(7).

**4.** *Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895) (mootness obtains when court cannot provide a remedy). *See also In re Stadium Management*, 895 F.2d at 847; *In re Continental Mortg. Investors*, 578 F.2d 872,

877 (1st Cir.1978) ("[a]n appeal is considered moot if it cannot affect the matter in issue or cannot grant effectual relief"); *In re Cantwell*, 639 F.2d 1050, 1053 (3d Cir.1981) ("[g]enerally, an appeal will be dismissed as moot when events occur ... which prevent the appellate court from granting any effective relief"); *Miami Center Ltd. Partnership v. Bank of New York*, 838 F.2d 1547, 1554 (11th Cir.), *cert. denied*, 488 U.S. 823, 109 S.Ct. 69, 102 L.Ed.2d 46 (1988) (case moot, as it had become "legally and practically impossible to unwind the confirmation of the plan or otherwise to restore the status quo" before confirmation); *In re Information Dialogues, Inc.*, 662 F.2d 475, 476 (8th Cir.1981) ("mootness concern arises when ... it may be impossible for a court to grant effective relief"); *In re Combined Metals Reduction Co.*, 557 F.2d 179, 189 (9th Cir.1977) ("where an act or event sought to be enjoined has been performed or has occurred, an appeal from the denial of the injunction will be dismissed as moot").

**5.** *See infra* note 19.

"affording finality to the judgments of the bankruptcy court." *Id.* (quoting *In re Revere Copper & Brass, Inc.*, 78 B.R. 17, 23 (S.D.N.Y.1987)); *In re Information Dialogues, Inc.*, 662 F.2d 475, 477 ("mootness doctrine promotes an important policy of bankruptcy law—that court-approved reorganizations be able to go forward in reliance on such approval unless a stay has been obtained"); *Algeran, Inc. v. Advance Ross Corp.*, 759 F.2d 1421, 1424 (9th Cir. 1985) (mootness doctrine recognizes "particular need for finality in orders regarding stays in bankruptcy"); *In re AOV*, 792 F.2d at 1149 (refusing to overturn plan, in part because of "virtues of finality").

Moreover, the equitable and jurisdictional considerations underlying the mootness doctrine are interactive, as "the finality rule limits the remedies a court can offer." *In re Stadium Management*, 895 F.2d at 847–48. Although in bankruptcy cases these concerns most often coincide in the context of transfers to good faith purchasers, *see* Bankruptcy Code § 363, 11 U.S.C. § 363, we have acknowledged that the same principles "pervade the Bankruptcy Code," *In re Stadium Management*, 895 F.2d at 848 (citing cases).

■ Appellants sought to stay the execution of the order of confirmation in the bankruptcy court, yet no attempt was made to appeal the denial of a stay.[6] Moreover, although stays were sought in the district court,[7] no appellate or mandamus relief was ever requested from the court of appeals *relating to a stay of the confirmation order.* Consequently, implementation of the confirmed plan proceeded apace. *See In re Roberts Farms, Inc.*, 652 F.2d 793, 798 (9th Cir.1981) (case moot, as appellants "failed and neglected diligently to pursue their available remedies to obtain a stay" of the confirmation order, letting transactions in reliance on the confirmed plan proceed which it would be inequitable, as well as impracticable, to undo).

In the meantime, the rate agreement had been approved by NHPUC on July 20, 1990, and the New Hampshire Supreme Court affirmed the NHPUC action on April 24, 1991, fulfilling the final unmet requirement for implementation of the reorganization plan. *See* 11 U.S.C. § 1129(a)(6).[8] At this time, by its own terms the reorganization plan was to go into effect within thirty days. Nevertheless, appellants took no steps either to request a prompt ruling on their motion for stay before the district court, or to obtain a stay-related writ of mandamus from, or file an interlocutory appeal with, the court of appeals. *See Connecticut Nat'l Bank v. Germain,* —— U.S. ——, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (28 U.S.C. § 1292 confers discretionary jurisdiction on court of appeals to entertain appeal from interlocutory district court order entered in bankruptcy appeal).[9]

---

**6.** Bankruptcy Rule 8005 provides, in part:
> A motion for a stay of the judgment, order, or decree of a bankruptcy judge, for approval of a supersedeas bond, or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance. Fed.R.Bankr.P. 8005.

**7.** More than two months after the entry of the order of confirmation by the bankruptcy court, a motion for stay was filed with the district court, but the district court rejected the motion, apparently for failure to comply with Rule 11(b), District of New Hampshire Local Rules, which provides as follows:
> (b) SEEKING CONCURRENCE IN MOTIONS
> The moving party shall certify to the court that he has made a good faith attempt to obtain concurrence in the relief sought. If moving party has obtained concurrence, he shall so state in the body of the motion so that the court may consider it without delay.

D.N.H. L.R. 11(b). Not until seven months later, on February 8, 1991, did appellants either attempt compliance with Local Rule 11 or otherwise renew their request for stay.

**8.** Bankruptcy Code § 1129(a)(6) provides that—
> The court shall confirm a plan only if all of the following requirements are met:
> . . . .
> (6) Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

Bankruptcy Code § 1129(a)(6), 11 U.S.C. § 1129(a)(6).

**9.** The failure of the district court to take prompt action on the motion for stay was tantamount to a denial of the stay. *Cf. United States v. Lynd,* 301 F.2d 818, 822 (5th Cir.), *cert. denied,* 371 U.S. 893, 83 S.Ct. 187, 9 L.Ed.2d 125 (1962)

Instead, appellants allowed the reorganization to go into effect on May 17, 1991. Although appellants, on August 8, 1991, requested a writ of mandamus to compel the district court to decide the *merits of their appeal,* the reorganization plan had gone into effect almost three months earlier, and we denied mandamus relief on grounds of mootness. In sum, whether through oversight or "procedural ineptitude," *see In re Roberts Farms,* 652 F.2d at 795 ("procedural ineptitude" in seeking stay no excuse); *In re Hamady Bros. Food Markets,* 110 B.R. 815, 818 (E.D.Mich.1990) (same), appellants failed to "pursue with diligence *all available remedies* to obtain a stay of execution of the objectionable order," *In re Roberts Farms,* 652 F.2d at 798 (emphasis added).

■ The failure to obtain a stay is not sufficient ground for a finding of mootness. *See, e.g., In re AOV,* 792 F.2d at 1147; *In re Block Shim Development Company–Irving,* 939 F.2d 289, 291 (5th Cir.1991); *In re Texaco,* 92 B.R. at 44.

Nevertheless, in the absence of a stay, interested parties are free to implement the confirmed reorganization plan according to its terms, and the consequent circumstances may moot the matter in dispute.[10] In these circumstances, the reviewing court must "scrutinize each individual claim, testing the feasibility of granting relief against the potential impact on the reorganization scheme as a whole." *In re AOV,* 792 F.2d at 1148; *Central States,* 841 F.2d at 96 ("court should reach a determination upon close consideration of the relief sought in light of the facts of the particular case"). The case is moot if the requested relief would be either inequitable[11] or impracticable[12] in light of the change in circumstances.

■ The absence of a stay allowed performance under the PSNH reorganization plan to proceed to a point well beyond any practicable appellate annulment.[13] The reorganization went into effect on May 16, 1991, when PSNH became committed to implement the numerous complex arrange-

---

10. As observed by one commentator—
[a] party who desires to appeal is not obliged to seek a stay of the judgment pending appeal. The only consequence of failing to obtain a stay is that the prevailing party may treat the judgment of the bankruptcy court as final, notwithstanding that an appeal is pending.... A stay pending appeal, usually in the form of an injunction, is necessary only if what may be done under the judgment is beyond the power of the appellate court to undo by its judgment. If the irreversible action is taken pending the appeal, the appeal will be dismissed as moot.
Lawrence D. King, 9 *Collier on Bankruptcy* ¶ 8005.04 at 8005–6 (15th ed. 1992).

(where district court's failure to rule on request for injunctive relief was determined reviewable by court of appeals since refusal to act had the practical effect of a denial of relief). In addition, appellants were entitled to a stay pending appeal upon posting a supersedeas bond. *See* Fed.R.Civ.P. 62(d); Fed.R.Bankr.P. 7001(5), (7) & 7062; *see also* Fed.R.Civ.P. 62(g). While we recognize the practical difficulties in posting a supersedeas bond in a matter of this magnitude, appellants did not propose a supersedeas bond in any amount. In any event, as explained below, appellants "should not have sat ... by while this case drifted along a routine, unexpedited course." *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.,* 841 F.2d 92, 95 (4th Cir.1988).

11. *See In re Roberts Farms,* 652 F.2d at 798 (absent a stay, "such a comprehensive change of circumstances ... [may] occur as to render it inequitable for th[e] court to consider the merits of the appeal"); *In re Crystal Oil Co.,* 854 F.2d 79, 82 (5th Cir.1988) (given failure to seek a stay and the resulting "comprehensive change of circumstances," relief would be "plainly inequitable"); *In re Information Dialogues,* 662 F.2d at 477 (same).

12. *See In re Kahihikolo,* 807 F.2d 1540, 1542 (11th Cir.1987) ("in the absence of a stay, action of a character which cannot be reversed by the court of appeals may be taken in reliance on the lower court's decree [a]s a result [of which] the court of appeals may become powerless to grant the relief requested by the appellant") (quoting *American Grain Assoc. v. Lee–Vac, Ltd.,* 630 F.2d 245, 247 (5th Cir.1980)); *see also In re Stadium Management,* 895 F.2d at 847 (absent a stay, appeal must be dismissed as moot when court of appeals cannot fashion a remedy).

13. Of course, "substantial consummation" *per se* is insufficient to moot an appeal from an order of confirmation, *In re AOV,* 792 F.2d at 1148; *Central States,* 841 F.2d at 96; *In re King Resources Co.,* 651 F.2d 1326, 1332 (10th Cir.1980), but it raises a "strong presumption" that an appellate court will not be able to fashion an equitable and effective remedy, *In re AOV,* 792 F.2d at 1149; *In re Texaco,* 92 B.R. at 46.

ments required to enable its restructuring and to finance the distributions contemplated under the confirmed plan.[14] In furtherance of these arrangements, all but one mortgage and all indentures, securities and associated agreements and encumbrances relating to the PSNH prepetition indebtedness were released and the lone remaining mortgage encumbrance was substantially modified. Furthermore, on the effective date of the reorganization plan, all preexisting equity interests in PSNH were exchanged for replacement securities, including approximately 32,000,000 shares of PSNH common stock, notes aggregating $205,000,000, and more than 8,000,000 certificates evidencing contingent rights to acquire, upon PSNH's eventual merger with NUSC and Northeast Utility, *see supra* note 2, warrants to purchase common stock in the emergent entity.

Approximately $1,530,000,000 and 8,000,000 newly-issued contingent warrant certificates were delivered to the distributing agent on May 16, 1991, and distributions commenced the next day. Consequently, in accordance with the terms of the confirmed plan, more than 100,000 individuals and entities received, or became entitled to receive, various forms of securities in full satisfaction of their PSNH claims and interests. The new securities issued to generate the monies needed to fund distributions to creditors have been publicly traded since May 1991. Thus, the innumerable transfers legitimately effected to and among innocent third parties in the absence of a stay, and in reliance on the order of confirmation and the rate agreement challenged on appeal, *see* 11 U.S.C. § 1129(a)(6), plainly represent so substantial a consummation of the reorganization plan as to render the requested appellate relief impracticable.

Moreover, a pair of related considerations reinforces the strong presumption disfavoring an appellate remedy which would undermine the entire reorganization.[15] First, an appellate reversal of the substantially consummated reorganization plan in the present case would "creat[e] ... a nightmarish situation for the bankruptcy court on remand," *In re Texaco*, 92 B.R. at 50; *see also In re Roberts Farms*, 652 F.2d at 797 (requested relief "would do nothing other than create an unmanageable, uncontrollable situation for the Bankruptcy Court"), and make reconstructive relief extremely improbable. Second, the reversal of a reorganization plan substantially consummated in the absence of a stay of the order of confirmation would run counter to the important policy favoring finality in bankruptcy proceedings. *See id.* at 798.

The PSNH reorganization entailed financing arrangements involving more than $1.5 billion and 100,000 sources, none of which "stand independently and apart from the [reorganization] plan ...," *see id.* at 797, and all of which were undertaken in reliance on the confirmed plan.[16] Appellate

---

**14.** These financial arrangements included issuance of PSNH first mortgage bonds aggregating $342,500,000 in an underwritten public offering; issuance of 5,000,000 shares of PSNH preferred stock at a par value of $25 per share; and loans from various banking institutions amounting to over $1 billion, guaranteed by the New Hampshire Industrial Development Authority.

**15.** *See, e.g., In re Roberts Farms*, 652 F.2d at 797 (requested relief "would knock the props out from under the authorization for every transaction that has taken place"); *In re AOV*, 792 F.2d at 1149 (finding "moot" all claims except those which would "not affect the reemergence of the debtor as a revitalized entity"); *Central States*, 841 F.2d at 96 (requested relief would work "a complete reversal of the plan of reorganization"); *In re Block Shim*, 939 F.2d at 291 (claims moot where reversal "would not only jeopard-

ize, but eviscerate, the plan and thwart [debtor's] attempts to reorganize"); *Miami Center Ltd. Partnership*, 838 F.2d at 1556 (requested relief would "jeopardize entire plan" and "disrupt a very successful reorganization"); *In re Crystal Oil Co.*, 854 F.2d at 81–82 (requested relief would "strike at reorganization plan as a whole"); *In re Texaco*, 92 B.R. at 91 (case moot where "relief sought goes to the very core of the Reorganization Plan and cannot be severed").

**16.** The Prospectus issued in connection with the offering of $342,500,000 in PSNH first mortgage bonds stated: the "Rate Agreement provides the financial basis for the Plan." The Prospectus described "an amendment or modification of any governmental approval required to give effect to the Rate Agreement ... [,] which in the Banks' opinion may have a material adverse effect on the Company," as an "event of default" under the terms of the Credit Agreements (total-

reversal of an order confirming a substantially consummated reorganization plan constructed within the framework of so many "intricate and involved transactions[ ] ... *solely* [founded on] the order confirming the plan....," *id.* (emphasis in original), would present a daunting assignment for the Humpty Dumpty repairman. *See In re Texaco*, 92 B.R. at 46 ("in practical terms if nothing else, a virtually impossible task...."). Moreover, unraveling the substantially consummated PSNH reorganization plan would work incalculable inequity to many thousands of innocent third parties who have extended credit, settled claims, relinquished collateral and transferred or acquired property in legitimate reliance on the unstayed order of confirmation. *See, e.g., In re Texaco*, 92 B.R. at 45 (when "hundreds or even thousands of good-faith transactions by innocent parties" may have been undertaken in reliance on the confirmed reorganization plan, "it would be manifestly unjust to reverse on appeal"); *see also supra* note 15.

Appellants argue, however, that it may be practicable to fashion less sweeping relief without adversely affecting innocent third parties.[17] Appellants assume, of course, that their claimed constitutional entitlement to recover all prudent investment in Seabrook will not only prevail but result in a more profitable PSNH than would emerge under the confirmed reorganization plan. We resist their belated speculation, for several reasons.

First, at the very least, setting aside the confirmed reorganization plan would adversely affect investors in the reorganized PSNH who acted in legitimate reliance on the order of confirmation in the absence of a stay. *See, e.g., Central States*, 841 F.2d 92 (modification of the plan would affect rights of investors in reorganized company); *Valley Nat'l Bank v. Trustee for Westgate–California Corp.*, 609 F.2d 1274 (9th Cir.1979), *cert. denied*, 444 U.S. 1015, 100 S.Ct. 667, 62 L.Ed.2d 645 (1980) (same); *In re Texaco*, 92 B.R. 38 (same). Second, appellants' contention that all concerned would be better off if PSNH were to litigate a rate case has been roundly rejected at every turn, in every venue.[18] Third, were the court to credit appellants' reconstructive scenario, we would be rearranging the stage on which the financial calculations of *nonparty* investors in the reorganized company were set and their investments reliantly made. *See Block Shim*, 939 F.2d at 291 (appeal of confirmation order moot where reversal would adversely affect rights of third parties not before the court); *In re AOV*, 792 F.2d at 1149 (only appellate claims not considered moot are those not having adverse effect on interests of parties not before the court); *Cen-*

---

ling $652,000,000) with the various lenders. Additionally, the prospectus states that any "default under the Credit Agreements which results in the taking of any action by or on behalf of the banks to foreclose or otherwise realize against the trust estate for the bonds" would be an event of default under the indenture securing the mortgage bonds. Finally, at oral argument appellees represented that there is no contingency plan relating to a revocation of the order confirming the reorganization plan. Appellants do not suggest otherwise.

17. For example, appellants suggest that the court could simply "require" Northeast Utilities "to convert its common stock in Reorganized PSNH into a preferred stock or debt in an amount equal to what it paid for the Reorganized Common and then spin the company off to the [shareholders of prepetition PSNH]." According to appellants, their proposed PSNH stock conversion and spinoff would benefit the holders of impaired equity interests in PSNH without adversely affecting equity interests in the reorganized company. We would note, however, that the confirmed reorganization plan prohibits PSNH from issuing additional preferred stock without the consent of holders of a majority of the outstanding PSNH preferred stock.

18. The concededly uncertain enterprise of forecasting an optimal, practicable rate structure for PSNH has been extensively examined and invariably resolved adversely to appellants within all three venues of New Hampshire government, the financial and securities markets, and by the bankruptcy court following a referendum among all PSNH creditors and interest holders. *See* 11 U.S.C. § 1129(a)(7). We need not reach the merits of appellants' claims on appeal in order to observe that their roundly-rejected contentions may not be *assumed* as the major premise for their argument that holders of equity interests, as well as creditors, would be well served if required to take their chances on the outcome of a litigated rate case.

*tral States*, 841 F.2d at 96 (court may not adversely affect parties not before it); *In re Texaco*, 92 B.R. at 51 (since appellants failed to obtain stay and the positions of "so many third parties [are] now radically changed in reliance on the Confirmation Order, the equities cut decisively against this appeal"). Finally, we would be without jurisdiction to effect the recommended relief in any event. *Central States*, 841 F.2d at 96 (court "without jurisdiction to impose substantial adverse consequences upon those absent"); *Valley Nat'l Bank*, 609 F.2d at 1283 (mootness obtains if court lacks jurisdiction over "vast majority of persons" affected by merger).[19]

## III

### CONCLUSION

Overriding jurisdictional, equitable and practical considerations counsel dismissal of the present appeal on the ground of mootness, as the absence of a stay pending the appeal of the order confirming the reorganization plan permitted its implementation to so substantial an extent as to leave the court powerless to grant fair and effective relief.

*The appeal is dismissed; costs to appellees.*

---

**19.** The present appeal involves jurisdictional considerations closely analogous to appeals determined moot due to loss of jurisdiction over the *res*, or the parties, occasioned by their removal or transfer from the jurisdiction in the absence of a stay or injunctive relief pending appeal. *See, e.g., United States v. One Lear Jet Aircraft*, 836 F.2d 1571, 1574 (11th Cir.), *cert. denied*, 487 U.S. 1204, 108 S.Ct. 2844, 101 L.Ed.2d 881 (1988) (failure to obtain stay of forfeiture order rendered case moot upon removal of subject property from jurisdiction); *L.B. Harvey Marine, Inc. v. M/V "River Arc"*, 712 F.2d 458 (11th Cir.1983) (case became moot when vessel left jurisdiction in absence of stay of order denying arrest); *Alyeska Pipeline Service Co. v. The Vessel Bay Ridge*, 703 F.2d 381 (9th Cir.1983), *cert. dismissed*, 467 U.S. 1247, 104 S.Ct. 3526, 82 L.Ed.2d 852 (1984) (same).