IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-11103
_____


In The Matter Of: HAMMERSMITH DEVELOPMENT COMPANY;
LOUIS G REESE, III

                              Debtors

--------------------------------

ADVANTAGE CAPITAL GROUP INC

                              Appellant

     v.

HAMMERSMITH DEVELOPMENT COMPANY; LOUIS G REESE, III;
SUSAN B REESE; MILO H SEGNER, Chapter 11 Trustee

                              Appellees

_____

Appeal from the United States District Court
for the Northern District of Texas
No. 3:00-CV-1424-R
_____
January 30, 2001

Before KING, Chief Judge, and HIGGINBOTHAM and DUHÉ, Circuit
Judges.

KING, Chief Judge:[*]

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

Appellant Advantage Capital Group, Inc., a creditor in a consolidated bankruptcy proceeding, appeals from the district court's dismissal of its appeal from the bankruptcy court's order of plan confirmation. The district court dismissed the appeal on the ground of mootness. Based upon the facts before us, we conclude that the merits of this appeal are moot and, therefore, DISMISS the appeal.

## I. FACTUAL AND PROCEDURAL HISTORY

There are two debtors involved in this case: Louis G. Reese, III ("Debtor Reese") and Hammersmith Development Company ("Debtor Hammersmith"). Debtor Reese is a real estate developer who filed for Chapter 11 bankruptcy on February 5, 1998, due to several judgments against him arising from his participation in the savings and loan crisis in the 1980s. Debtor Reese is the sole owner of Debtor Hammersmith, a real estate development company that filed Chapter 11 bankruptcy on January 22, 1998.

The Federal Deposit Insurance Corporation ("FDIC") has judgment claims against Reese, including a $3.45 million secured claim (a criminal restitution judgment) and additional unsecured claims. In 1993, the FDIC sold one of its unsecured claims to Appellant Advantage Capital Group, Inc. ("Advantage"). From the beginning, Advantage has alleged that Debtor Reese retains hidden assets.

2

On March 13, 1998, the bankruptcy court appointed Milo H. Segner, Jr. ("Trustee Segner") as Chapter 11 trustee. Advantage, Trustee Segner, and the FDIC have investigated Debtor Reese's finances in an effort to uncover these hidden assets. In fact, the FDIC, through the Office of the Inspector General, opened its own official investigation into Debtor Reese's finances. To date, however, no evidence has been produced showing that these assets exist. Because the FDIC failed to uncover any hidden assets, the FDIC, Trustee Segner, Debtor Reese, and his wife Susan Reese engaged in negotiations in order to satisfy the FDIC's $3.45 million judgment against Debtor Reese. From these negotiations, Trustee Segner formulated a Chapter 11 Joint Plan for Reorganization (the "Plan").[1]

On March 13, 1998, the bankruptcy court ordered the joint administration of Debtor Reese's and Debtor Hammersmith's bankruptcy cases. Debtor Reese, Debtor Hammersmith, Trustee

---

[1] The Plan establishes the following six classes of claims: (1) Class 1 contains the FDIC's $3.45 million nondischargeable secured claim; (2) Class 2 contains general unsecured claims, including the unsecured claims of the FDIC and Advantage; (3) Class 3 contains the claims of general unsecured creditors who have chosen to "opt-out" of Class 2 (there are no creditors in this class); (4) Class 4 contains the claims of the Louis and Theta Reese Grandchildren's Trust; (5) Class 5 contains Debtor Reese's interests in Hammersmith; and (6) Class 6 contains an unknown amount of claims from the ad valorem taxing authorities. The only other relevant claims against the Debtor estates are the administrative claims, totaling $400,000.

Segner, and Susan Reese are proponents of the Plan and Appellees herein (collectively the "Plan Proponents").

Pursuant to the Plan, the FDIC was to be paid $500,000 in exchange for a release of its $3.45 million judgment against Debtor Reese and a release of the accompanying priority lien against the Reese homestead. To pay the required $500,000, the Plan provided that Susan Reese was to infuse $901,000 into the Debtor estates. From this $901,000, the Debtor estates were to pay $500,000 to the FDIC to satisfy its nondischargeable secured claim and $400,000 to the administrative professionals.[2]

The general unsecured creditors (Advantage and the FDIC) received a secured promissory note (the "Note") in the amount of $2.5 million.[3] The Note is secured by (1) a pledge of all of the reorganized Hammersmith stock; (2) a $500,000 collection guaranty executed by Susan Reese; and (3) the Lake Lewisville Property.[4]

---

[2] The remaining $1000 was to be paid to the Class 4 claims, see supra note 1, then worth approximately $9,592,832.

[3] The general unsecured creditors had the option of choosing their pro rata share of $100,000. Therefore, Advantage, being the 71.5% holder of the claims in this class, would have received $71,500, and the FDIC would have received $28,500. Neither party chose this option.

[4] Pursuant to section 7.2(i) of the Plan, Lake Lewisville Resort, Inc. (currently called "Gerbaxal, Inc.") was to execute a quitclaim deed transferring the Lake Lewisville Property to Debtor Reese, who in turn was to execute a quitclaim deed transferring the property to Debtor Hammersmith. In actuality, it appears that Gerbaxal, Inc. transferred the property to Greenville Holdings Company (owned by Susan Reese), which then transferred the property to Debtor Hammersmith.

4

The Note is to be funded by a portion of the profits from the reorganized Hammersmith, and a certain portion of the profits generated by Hammersmith from the sale of the property is to be used to pay the general unsecured creditors pursuant to the Note.

Under the Plan, Advantage was a member of an impaired[5] noninsider class of creditors.  A vote of the impaired classes was taken, and Advantage objected to the Plan.  Because Advantage held 71.5% of the claims in its class, the entire class was deemed to have objected to the Plan.  See 11 U.S.C. § 1126(c) (1993).  On May 12, 2000, the bankruptcy court confirmed the Plan, as amended, over Advantage's objections.  Because an impaired class was considered to have rejected the Plan, the Plan was confirmed as a "cramdown" plan pursuant to 11 U.S.C. § 1129(b)(1) (1993).

On June 21, 2000, Advantage filed with the bankruptcy court an Emergency Motion for Stay of Consummation of Plan Pending Appeal.  On June 23, Advantage filed a notice of appeal to the district court.  On June 28, the bankruptcy court denied Advantage's motion for a stay.  Then, on June 30, Advantage filed an Emergency Motion for Stay Pending Appeal in the district court.  The district court denied Advantage's motion for a stay on July 6, but granted its request for an expedited appeal on

---

[5]  A class of creditors is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights" of each class member.  See 11 U.S.C. § 1124(1) (2000).

July 21.  After oral argument on September 28, the district court granted Appellees' Motion to Dismiss Appeal for Mootness.[6]

Prior to oral argument in the district court, on September 11, Trustee Segner filed administrative fee applications with the bankruptcy court.  After a hearing on October 5, the bankruptcy court approved the applications and entered orders that expressly authorized the compensation to be paid immediately.[7]  At the entering of these orders on October 6, Trustee Segner disbursed a total of $400,000 to the administrative professionals.

Also on October 6, Advantage filed its Notice of Appeal to this court.  When Advantage filed its Notice of Appeal, it also filed a Motion for Stay of Consummation of Plan Pending Appeal.

_____

[6]  We note that the district court's order was not entirely clear as to the basis of its judgment.  In its succinct order, the district court first found the appeal to be moot and then went on to reach the merits of the appeal, affirming the bankruptcy court's decision to confirm the Plan.  In the end, the order did not state specifically that the appeal was "dismissed" as moot.  We recognize that mootness in the bankruptcy context is prudential, rather than jurisdictional.  See Kearns v. Vineyard Bay Dev. Co (In re Vineyard Bay Dev. Co.), 132 F.3d 269, 271 (5th Cir. 1998).  However, because a finding of mootness in the bankruptcy setting is also premised in part on jurisdictional concerns, see Rochman v. Northeast Utils. Serv. Group (In re Pub. Serv. Co.), 963 F.2d 469, 471 (1st Cir. 1992); Deloitte & Touche LLP v. Aquila Biopharm., Inc. (In re Cambridge Biotech Corp.), 214 B.R. 429, 431 (Bankr. D. Mass. 1997), we conclude that the district court effectively dismissed the appeal by its finding of mootness.  Accordingly, we do not address the holdings directed to the merits of the case.

[7]  Advantage did not file an objection to these applications for administrative fee payments, nor did any other party.  Because no party objected to any fee applications filed in the case, the bankruptcy court's order provided for the immediate payment of the professional fees.

6

On October 12, a panel of this court entered an order granting a temporary stay. On October 19, the Plan Proponents filed a motion with this court to dismiss the appeal for mootness. Finally, on November 1, 2000, the panel entered an order granting Advantage's motion for stay, expediting the appeal, and carrying with the case the Plan Proponents' motion to dismiss.

## II. STANDARD OF REVIEW

In reviewing a district court's dismissal of an appeal as moot, the district court's findings of fact are reviewed under the clearly erroneous standard. See United States v. GWI PCS 1, Inc. (In re GWI PCS 1, Inc.), 230 F.3d 788, 799 (5th Cir. 2000); Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.), 939 F.2d 289, 291 (5th Cir. 1991). The bankruptcy court's conclusions of law are reviewed de novo. See id.; see also Manges v. Seattle-First Nat'l Bank (In re Manges), 29 F.3d 1034, 1038-44 (5th Cir. 1994) (conducting an independent review of the district court's dismissal for mootness).

## III. THE APPEAL IS MOOT

The standard for mootness in the bankruptcy context differs from a constitutional mootness analysis. See Nationwide Mut. Ins. Co. v. Berryman Prods., Inc. (In re Berryman Prods., Inc.), 159 F.3d 941, 944 (5th Cir. 1998); Manges v. Seattle-First Nat'l Bank (In re Manges), 29 F.3d 1034, 1038-39 (5th Cir. 1994). In the bankruptcy setting, mootness is "not an Article III inquiry

7

as to whether a live controversy is presented; rather, it is a recognition by the appellate courts that there is a point beyond which they cannot order fundamental changes in reorganization actions." Manges, 29 F.3d at 1038-39.  Consequently, a reviewing court may decline to consider the merits of an appeal when it determines that "effective judicial relief is no longer available."  Id. at 1039; see also Berryman Prods., Inc., 159 F.3d at 944.  This is so even if there is a viable dispute between the parties on appeal.  See Manges, 29 F.3d at 1039.

This court has traditionally turned to three factors to determine whether mootness counsels against a review of the merits: (1) whether a stay has been obtained, (2) whether the plan at issue has been "substantially consummated," and (3) whether the relief requested would affect either the rights of third parties not before the court or the success of the plan. See id.; see also Ins. Subrogation Claimants v. U.S. Brass Corp. (In re U.S. Brass Corp.), 169 F.3d 957, 959 (5th Cir. 1999); Berryman Prods., Inc., 159 F.3d at 944; Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.), 939 F.2d 289, 291 (5th Cir. 1991).  The Plan Proponents argue that each of these factors favors a finding of mootness.  We address each factor in turn.

A. Failure to Obtain a Stay

8

On June 21 and 30, 2000, Advantage filed emergency motions for a stay with the bankruptcy court and district court, respectively. These motions were denied. On October 6, 2000, Advantage appealed the district court's judgment and filed a third motion for a stay. A panel of this court first granted a temporary stay on October 12 and then granted a stay pending appeal on November 1.

It is undisputed that at the time the district court found the appeal moot, no stay was in effect. Advantage contends that it "diligently sought" a stay; however, whether a stay was diligently pursued is not the critical inquiry. Instead, "[a] stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization." Berryman Prods., Inc., 159 F.3d at 944-45 (alteration in original) (internal quotations omitted) (quoting Manges, 29 F.3d at 1040).

Advantage unsuccessfully petitioned both the bankruptcy court and the district court for a stay and did not seek mandamus relief with this court at the time the district court denied its request. Following the denial of a stay in the bankruptcy court, Susan Reese had paid the $901,000 required to consummate the Plan and the FDIC had been paid and had executed the necessary releases. During the expedited appellate process in the district court, no stay was in effect, and the Plan was implemented even further. Accordingly, because no stay was in place at the time of consummation, this factor "militates in favor of dismissal for

9

mootness." <u>United States v. GWI PCS 1, Inc.</u> (<u>In re GWI PCS 1,</u>
<u>Inc.</u>), 230 F.3d 788, 801 (5th Cir. 2000); <u>see also</u> <u>Berryman</u>
<u>Prods., Inc.</u>, 159 F.3d at 945; <u>Manges</u>, 29 F.3d at 1040 ("In
short, the failure or inability to obtain a stay pending appeal
carries the risk that review might be precluded on mootness
grounds.").

B. Substantial Consummation

The second consideration of the mootness inquiry is whether
the Plan has been substantially consummated.[8]  "'Substantial
consummation' is a statutory measure for determining whether a
reorganization plan may be amended or modified by the bankruptcy
court."  <u>Manges</u>, 29 F.3d at 1040 (citing 11 U.S.C. § 1127(b)
(1993)).  This court has adopted the "substantial consummation"
yardstick "because it informs our judgment as to when finality
concerns and the reliance interests of third parties upon the
plan as effectuated have become paramount to a resolution of the
dispute between the parties on appeal."  <u>GWI PCS 1, Inc.</u>, 230

---

[8]  Section 1101(2) of the Bankruptcy Code defines
"substantial consummation" as:

> (A) transfer of all or substantially all of the
> property proposed by the plan to be transferred;
> (B) assumption by the debtor or by the successor to the
> debtor under the plan of the business or of the
> management of all or substantially all of the property
> dealt with by the plan; and
> (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2) (1993).

F.3d at 801 (internal quotations omitted) (quoting Manges, 29 F.3d at 1041).

We find that the Plan in the instant appeal has been "substantially consummated" such that "effective judicial relief is no longer available." Manges, 29 F.3d at 1039; see also U.S. Brass Corp, 169 F.3d at 961. Pursuant to the Plan, the $2.5 million Note has been executed; Susan Reese has executed a $500,000 collection guaranty to secure the Note; Susan Reese has infused $901,000 into the bankruptcy estates; the Lake Lewisville Property has been transferred to Debtor Hammersmith[9]; at least one lawsuit has been dismissed with prejudice; releases to Susan Reese and other Reese entities have been granted; the reorganized Hammersmith stock has been assigned to the creditor representative as collateral for the $2.5 million Note; an employment agreement has been executed between Debtor Reese and the reorganized Hammersmith; $500,000 has been distributed to the FDIC; on receipt of the $500,000 payment, the FDIC released its lien against the Reese homestead, and Satisfaction of Judgment was entered in its criminal restitution action; the $400,000 in administrative fees has been disbursed to the administrative professionals; and the Debtors have received their discharge.

---

[9] Advantage points to the fact that title insurance on the Lake Lewisville Property has apparently not yet been obtained and argues that this fact alone prevents the Plan from being considered "substantially consummated." We reject that argument, requiring, as it does, that we blind ourselves to the many Plan provisions that have been effectuated here.

The Plan Proponents argue that the only actions contemplated by the Plan that remain are the "forward business operations" of the reorganized Hammersmith and payment on the Note.

To unravel the Plan now would require reversal of each of these transactions.  Most convincingly, the FDIC would be forced to return the $500,000, would likely be unable to reassert the suit against Debtor Reese, and has very likely lost its first lien priority on the Reese homestead.  Moreover, Susan Reese would be unable to recover the $901,000, as it has already been disbursed to the FDIC and the administrative professionals, and the superpriority claim that we are urged to give Ms. Reese in its place is hardly the equivalent of cash.  In sum, all or substantially all of the property contemplated by the Plan to be transferred has been transferred; Debtor Reese has assumed the business and management of the reorganized Hammersmith and is engaging in business activities in order to fund the Note secured by the Hammersmith stock; and distribution under the Plan has, at the very least, been commenced, if not completed.  Accordingly, in the absence of a stay, we find that the Plan has been substantially consummated.  See 11 U.S.C. § 1101(2) (1993); see also U.S. Brass Corp., 169 F.3d at 961 ("We find the transactions that have taken place to date, the exchange of mutual releases, the disbursements already made, and the general implementation of the plan by all the involved parties evidence substantial

12

consummation of the plan.").  As such, substantial consummation weighs against reviewing the merits of the challenged Plan.

### C. Effect on Third Parties or the Success of the Plan

Our final inquiry is whether the requested relief would affect the rights of third parties not before the court or the success of the Plan.  While Advantage appears to argue that the only relevant inquiry is the effect on third parties, we recognize that the analysis of this factor has two dimensions: (1) the effect on third parties or (2) the effect on the success of the Plan.  See Berryman Prods., Inc., 159 F.3d at 945-46; see also Manges, 29 F.3d at 1039 ("whether the relief requested would affect either the rights of parties not before the court or the success of the plan" (emphasis added)).  The Plan Proponents argue that both of these dimensions are met in this case, and we agree.

First, regarding the rights of third parties, the district court found that the FDIC's interests would be irreparably injured if the Plan was unwound.  Moreover, pursuant to the Plan and by order of the bankruptcy court, Trustee Segner has since disbursed $400,000 in payments to the administrative professionals.  These disbursements occurred before a stay was in place and to reverse them would have a detrimental financial effect on the FDIC and these administrative professionals.

In addition, as discussed above, unwinding the Plan would require, inter alia, the return of property and distributions,

13

the reinstatement of lawsuits dismissed with prejudice, and the reattachment of liens.  It is unlikely that this court could return the Debtor estates or the affected third parties to the status quo as it existed before consummation of the Plan.  As alluded to above, in his affidavit, Frank Deramus, General Counsel for the FDIC, stated that, by releasing its lien on the homestead, the FDIC gave up its first lien priority.  Deramus contends that "it may not be able to now regain its first lien priority position."  Therefore, the FDIC will "not voluntarily disgorge the [$500,000] Payment, and will only do so upon court order."  Finally, the bankruptcy court, in determining whether to grant a stay, found that "[i]t appears that if the stay is granted there could be harm to the FDIC and the administrative claimants and Mr. Reese, and the feasibility of the plan will decline with consequent harm to such other parties."

Looking to the second dimension of the inquiry mandated by Manges, we note that Advantage seeks to set aside the entire Plan.  The Plan Proponents assert that "the success of the Plan is dependent upon the transactions which have taken place."  All of the acts that have occurred, e.g., execution of the Note, the infusion of $901,000 into the Plan by Susan Reese, the transfer of the Lake Lewisville Property, and the execution of releases, were all conditions to the Plan becoming effective.  To reverse these transactions at such a late date would result in "nothing

14

less than a wholesale annihilation of the Plan." Manges, 29 F.3d at 1043.

Moreover, the Plan was the result of extensive negotiations between the Plan Proponents and the FDIC, one of the Debtors' principal creditors. Causing the FDIC to return the $500,000 would most likely unravel the entire Plan. Therefore, we conclude that allowing Advantage to set aside the Plan, would, by definition, negatively impact its success. See In re Block Shim Dev. Co., 939 F.2d at 291 ("Indeed, granting appellants the relief they seek would not only jeopardize, but eviscerate, the plan and thwart [the debtor's] attempts to reorganize.").

Therefore, we conclude that this factor also weighs in favor of dismissal.

## IV. CONCLUSION

For the foregoing reasons, we conclude that effective judicial relief is no longer available to the parties and DISMISS the appeal as moot.

15