In the Matter of EDDINGTON THREAD MANUFACTURING COMPANY, INC., Debtor.

Civ. A. No. 95–4029.
Bankruptcy No. 92–23608SR.

United States District Court,
E.D. Pennsylvania.

Nov. 27, 1995.

Allen B. Dubroff, Astor, Weiss & Newman, Philadelphia, PA, Howard T. Glassman, Regina Stango–Kelbon, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Eddington Thread Mfg. Co., Inc.

Lewis H. Gold, Alan Moldoff, Adelman, Lavine, Gold & Levin, Philadelphia, PA, for Ylvia Teich, Erman Tannenbaum.

Pace Reich, Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, for Committee of Unsecured Creditors.

Kevin P. Callahan, Trustee, Philadelphia, PA, pro se.

1. This court has jurisdiction under 28 U.S.C.A. § 158(a) (West 1995).

2. Sylvia Teich's husband, now deceased, founded Eddington Thread with Martin Tannenbaum and Irving Tannenbaum in the 1940s. Although she now objects to the treatment of her equity interests under the confirmed plan, Sylvia Teich earlier voted for a plan promoted by Herman Tannenbaum that also would have extinguished her equity interests. (Bankruptcy Court Opinion at 8)

Regina Stango–Kelbon, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Irving Tannenbaum.

## MEMORANDUM AND ORDER

YOHN, District Judge:

Sheila Teich and Herman Tannenbaum ("Appellants"), a former stockholder and an unsecured creditor of Eddington Thread Manufacturing Co., Inc. ("Eddington Thread" or "Debtor"), have appealed the bankruptcy court's confirmation of a reorganization plan.[1] The plan's proponents, Max Berger and Irving Tannenbaum ("Plan Proponents"), now urge this court to dismiss the appeal as moot. They are joined in this request by the Official Committee of Unsecured Creditors of Eddington Thread and by the Debtor itself.

Since meaningful judicial relief on appellants' claims consistent with the Bankruptcy Code is precluded, the court grants appellants' motion to dismiss.

### I. Background

Eddington Thread is a closely held corporation that manufactures industrial sewing thread, employing over one hundred people in two cities. When it filed a voluntary petition under chapter 11 on September 17, 1992, Debtor's shareholders were Max Berger, Martin Tannenbaum, Irving Tannenbaum, and Sylvia Teich.[2] Herman Tannenbaum, Sylvia Teich's nephew and the principal of a competitor company, purchased a claim of $140 after the bankruptcy filing, becoming an unsecured creditor.[3] Debtor operated as a debtor-in-possession throughout the proceedings that followed.[4]

3. Sylvia Teich's son, Leonard Teich, is one of Herman Tannenbaum's business partners at Middleburg Thread, a competitor of Debtor.

4. As of August 31, 1994, Eddington Thread had a liquidation value of only $1.3 million. (Bankruptcy Court Opinion at 2) Its liabilities included the bank's secured claim of approximately $680,000, administrative expenses of approximately $820,000, and general pre-petition unsecured claims of approximately $950,000. (Bankruptcy Court Opinion at 2–3)

After a bidding war of sorts with Herman Tannenbaum[5], Max Berger and Irving Tannenbaum filed the plan that, in amended form, was confirmed by the bankruptcy court on May 17, 1995.[6] Herman Tannenbaum and Sylvia Teich, the "lone Objectors to confirmation" (Bankruptcy Court Opinion at 8), filed a notice of appeal on May 30, 1995. However, they did not seek a stay of the confirmed plan, and the plan became effective on June 5, 1995.[7]

The confirmed plan divides Eddington Thread's creditors into four categories: (1) the secured claim of CoreStates bank ("bank secured claim"); (2) the secured claim of Linda Liebman, an officer of Debtor and the daughter of Irving Tannenbaum ("Liebman secured claim"); (3) all general unsecured claims; and (4) the unsecured claims of Eddington Thread's principal landlord, an entity controlled by Irving Tannenbaum; of Irving Tannenbaum; and of Eastwood Yard, a concern related to Max Berger's interests ("insider general unsecured claims").

Under the plan, the bank is to receive $18,000 per month and a "balloon" payment of all outstanding principal and interest on December 31, 1996. The Liebman secured claim is to be paid in twelve equal installments of roughly $43,000 every four months; the first installment was to be made in October 1995. Creditors falling into the category of "general unsecured claims" had the option of receiving 45% of the money owed them in cash on June 5, 1995 or 20% on that date and future dividends for up to an additional 50% of the value of their claims.[8] The insider general unsecured creditors were to receive payment in twelve equal installments beginning in October 1995. In the event that Debtor cannot make all of its installments at a given time, a prioritization provision establishes whom will be paid first. Under this provision, the insider general unsecured claims are subordinated to the general unsecured claims.

Further, the plan provides that Martin Tannenbaum will receive $200 per week in disability/retirement benefits not previously owed him. Finally, the plan extinguishes all prior equity interests in Eddington Thread but issues new equity to the two plan proponents.

Alleging that the plan does not satisfy the requirements of the Bankruptcy Code and that the plan proponents have acted in bad faith, Herman Tannenbaum and Sylvia Teich raise eight separate issues on appeal.[9] However, the court may not address the merits of these claims if, as is argued by the plan proponents, the reorganization has already been substantially consummated in such a way as to preclude effective judicial relief.

The plan proponents, by way of an affidavit signed by Max Berger, have presented the court with a description of the transac-

---

5. The bankruptcy court described the history of the case as follows:

> Since the commencement of this Chapter 11 case, the Debtor has filed no less than four proposed reorganization plans. H. Tannenbaum has likewise filed two. The most recent H. Tannenbaum reorganization plan, which had proposed a 35 cent dividend to unsecured creditors, had in fact proceeded to the point of a confirmation hearing in May 1994. That confirmation hearing was canceled after the Court approved a request by two unsecured creditors to change their vote and reject the H. Tannenbaum Plan. This request was prompted by indications from the Debtor that it was prepared to offer a higher dividend to general unsecured creditors in a yet to be filed amendment to its then pending plan. The vote change left H. Tannenbaum with insufficient votes to attain confirmation of his Plan. The proposed higher dividend to unsecured creditors (45 cents) is a feature of the instant Plan of the Plan Proponents.

(Bankruptcy Court Opinion at 3–4)

6. "All creditor classes have voted unanimously or overwhelmingly to accept the terms of the Plan." (Bankruptcy Court Opinion at 7–8)

7. Appellants do not explain why they did not seek a stay of the bankruptcy court order.

8. Of general unsecured creditors who did not select a payment option, claimants holding allowed claims equal to or less than $1500 were deemed to have elected the first option, and claimants owed more than $1500 were deemed to have elected the second. (Report of Plan Voting at 3)

9. In exercising appellate review over bankruptcy court orders, the district court applies a clearly erroneous standard to findings of fact and a *de novo* standard of review to questions of law. *Matter of Jersey City Medical Center*, 817 F.2d 1055, 1059 (3rd Cir.1987).

tions that have taken place since the effective date of the plan. First, Max Berger borrowed $150,000 and loaned half that sum to Irving Tannenbaum. Together, they then loaned $140,000 to Eddington Thread so that it could make payments due on the reorganization plan's effective date. Through these actions, the plan proponents placed personal funds at risk for the purpose of promoting Eddington Thread's viability as a going concern.

The other transactions listed in Max Berger's affidavit are as follows:

1. Eddington Thread has begun to make monthly installments under the plan to CoreStates Bank. CoreStates has executed new loan documents reflecting payment obligations as set forth in the plan.

2. CoreStates has agreed not to take action against Irving Tannenbaum, who guaranteed Eddington's debt, or to collect on the judgment it holds against Irving Tannenbaum, for as long as Eddington Thread abides by the plan.

3. Eddington Thread has made payments toward administrative claims.

4. Eddington Thread has begun to issue weekly retirement benefits to Martin Tannenbaum.

5. Eddington Thread has made payments on all general unsecured claims in accordance with each creditor's choice of treatment under the plan. Those creditors who have received 45% of their allowed claims have released Eddington Thread from any further claims.

6. All pre-confirmation equity in Eddington Thread has been canceled and extinguished. New stock has been issued Max Berger and Irving Tannenbaum, the sole shareholders and directors under the plan.

7. Eddington Thread has entered into negotiations with its union concerning a new collective bargaining agreement.

8. Eddington Thread has entered into negotiations with its landlords concerning new leases.

9. Eddington Thread's Certificate of Incorporation has been amended.

Moreover, the plan proponents asserted in their June 1995 motion to dismiss that the bankruptcy court had scheduled July hearings on priority tax claims and on fourteen objections to claims.

In their brief, the plan proponents describe these transactions as "too inter-related and interdependent to be modified or reversed on a piecemeal basis." (Plan Proponents' Brief at 12) They argue, "Any attempt to provide a remedy on appeal would cause irreparable damage to Eddington, the loss of over 100 jobs and the likely liquidation of Eddington with no recovery for most creditors." (Plan Proponents' Brief at 12)

While not disputing that the transactions described by Max Berger have actually occurred, appellants claim that "nothing has occurred which either cannot be undone or which, in any event, would [not] occur anyway." (Appellants' Brief at 12) They state that the plan proponents could get back their loan and that all payments made could be returned. They describe the cancellation of pre-confirmation equity as a paper transaction, negotiations with Debtor's union and landlords as inconsequential "because if Eddington is to successfully reorganize these negotiations must take place in any event" (Appellants' Brief at 11), and the amendment of the Certificate of Incorporation as easily reversed by a second amendment. They distinguish cases in which bankruptcy appeals were found moot by pointing out that the Eddington Thread reorganization involved thousands not millions of dollars and dozens not thousands of creditors.

## II. Mootness doctrine

■■■ Since federal courts are constitutionally limited to deciding only actual cases and controversies, "an appeal must be dismissed as moot when an event occurs that prevents the appellate court from granting any effective relief, even if the dispute is decided in favor of the appellant." *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 150 n. 6 (3rd Cir.1986). However, a court may not dismiss an appeal as moot simply because the status quo *ante* cannot be restored. *In re Swedeland Dev. Group, Inc.,* 16 F.3d 552, 559–60 (3rd Cir.1994) (en banc).

■ The court's inquiry must focus on whether it "can fashion *some* form of meaningful relief." *Church of Scientology v. U.S.*, 506 U.S. 9, 113 S.Ct. 447, 450, 121 L.Ed.2d 313 (1992).[10] When sitting in bankruptcy, a district court "has general equitable powers [to fashion appropriate relief], but only insofar as those powers are applied in a manner consistent with the Code." *In re B. Cohen & Sons Caterers, Inc.*, 147 B.R. 369, 374 (Bankr.E.D.Pa.1992).

■ The United States Court of Appeals for the Third Circuit has recently dismissed a case as moot on "statutory and prudential" as opposed to constitutional grounds.[11] *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 559 (3rd Cir.1994) (en banc). Other courts of appeals have also held that equitable considerations may justify a decision not to reach the merits of a claim even when Article III does not require dismissal. *See, e.g., In re Public Serv. Co.*, 963 F.2d 469, 471 (1st Cir. 1992), *cert. denied*, 506 U.S. 908, 113 S.Ct. 304, 121 L.Ed.2d 226 (1992); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1147 (D.C.Cir. 1986). Equitable considerations include the value of finality in bankruptcy reorganizations as well as the related rights of innocent third parties who may have relied upon a confirmed reorganization plan. However, the court's available remedies are limited by rules concerning finality, *In re Public Service Co.*, 963 F.2d at 472, and the court does not have jurisdiction to alter substantially the rights of parties not before it. *Central States v. Central Transport, Inc.*, 841 F.2d 92, 96 (4th Cir.1988). Thus, in the context of bankruptcy, jurisdictional and equitable considerations are "interactive." *In re Public Service Co.*, 963 F.2d at 472.

The court need conduct only a single mootness analysis. The question is whether granting relief on appellants' claims would require the reversal of transactions that cannot practically and justly be undone.[12]

■ The Third Circuit has provided some general direction on when bankruptcy appeals should be deemed moot. For example, the mere fact that money has already changed hands does not mean that an appeal of a bankruptcy court order is moot. *Ray-*

10. In this case, the Church appealed an order to comply with an IRS summons of allegedly privileged tape recordings. By the time of the United States Supreme Court's review, the IRS had obtained the tapes from a third party. Nevertheless, the case was not deemed moot. The Court found that the Church's right to privacy could still be partially vindicated by an order that the government destroy or return any copies of the tapes still in its possession.

11. In *Swedeland*, the holder of a lien on debtor's property appealed from orders authorizing debtor to obtain loans on a superpriority basis. Appellant had not obtained a stay of the orders. With respect to one of the authorized loans, some but not all of the money had been disbursed to debtor by the time of the appeal. With respect to the other, all of the money had in fact been disbursed and used by debtor for working capital.

Debtor argued that the appeal was moot under the following provision of the Bankruptcy Code: The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt ... does not affect the validity of any debt so incurred ... to an entity that extended such credit in good faith, whether or not such an entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt ... were stayed pending appeal.

11 U.S.C.A. § 364(e).

The court held that the requirement was "not germane to a mootness analysis turning on an appellant's failure to obtain a stay pending appeal." *In re Swedeland Dev. Group*, 16 F.3d 552, 559 (3rd Cir.1994) (en banc). The court reasoned as follows: If section 364(e) were read to require, in the absence of a stay, the automatic dismissal of any appeal from an order authorizing new debt, then that section's references to "reversal or modification on appeal" would be meaningless. *Id.*

The court found no special justification for protecting a lender with respect to undisbursed funds. However, appeal of the order granting the completely disbursed loan was deemed moot on "statutory and prudential grounds." *Id.* at 559 n. 5. The only types of relief that the court could fashion were inconsistent with statutory protections. The appeal "may have been moot in the district court on Article III constitutional grounds as well as on statutory and prudential grounds. However, ... we have no need to make a separate constitutional analysis of that order." *Id.* at 159 n. 5 (citation omitted).

12. "Although the fact that a court could undo a completed act may not necessarily defeat the conclusion that a matter is moot, it is certainly a relevant factor for a court determining whether effective relief on a claim can be granted." *In the Matter of Andreuccetti*, 975 F.2d 413, 419 (7th Cir.1992).

*mark Indus., Inc. v. Lai,* 973 F.2d 1125, 1129 (3rd Cir.1992); *In re Allegheny Int'l, Inc.,* 117 B.R. 171, 178 (W.D.Pa.1990). On the other hand, the entry of judgments by other courts that are not subject to the reviewing court's control may render an appeal moot. *In re Cantwell,* 639 F.2d 1050, 1054 (3rd Cir.1981). Moreover, the court has stated in dicta that an appeal would likely be moot if, to provide relief, the court "were required to vacate the sale of property, order creditors to disgorge funds, vacate the order approving the disclosure statement, and vacate the order confirming the reorganization plan." *In re Marcus Hook Dev. Park, Inc.,* 943 F.2d 261, 267 (3rd Cir.1991).[13] The *Marcus Hook* court described such actions as "draconian." *Id.* at 268.

█ Where the requested relief would create a "nightmarish situation" for the bankruptcy court, a "daunting assignment for the Humpty Dumpty repairman," *In re Public Serv. Co.,* 963 F.2d at 474, the other factors militating against re-opening a confirmed reorganization plan are typically present. Specifically, in assessing whether a case is moot, the court must address the following questions:

> Has a stay pending appeal been obtained? If not, then why not? Has the plan been substantially consummated? If so, what kind [sic] of transactions have been consummated? What type of relief does the appellant seek on appeal? What effect would granting relief have on the interests of third parties not before the court? And, would relief affect the re-emergence of the debtor as a revitalized entity?

*In re B. Cohen & Sons Caterers, Inc.,* 147 B.R. 369, 376 (Bankr.E.D.Pa.1992), quoting *In re Club Assocs.,* 956 F.2d 1065, 1069 n. 11 (11th Cir.1992).

### III.   Has a stay pending appeal been obtained?

As stated above, appellants did not seek a stay of the bankruptcy court's May 17, 1995 order confirming the reorganization plan now in effect. Furthermore, they do not explain this failure. Rather, they claim that the appeal itself put the other parties on notice of the possibility of further court action.

"[T]here are only two statutory provisions in the Bankruptcy Code where a stay is specifically required to preserve a position pending appeal," *In re Highway Truck Drivers & Helpers Local Union # 107,* 888 F.2d 293, 297 (3rd Cir.1989), and, even when presented with compelling policy justifications, the United States Court of Appeals for the Third Circuit has declined to interpret principles of mootness in a way that would create a third. *In re Joshua Slocum, Ltd.,* 922 F.2d 1081, 1085 (3rd Cir.1990) (objector to order approving assignment of lease not required to obtain stay to preserve position). *See also, In re Swedeland Dev. Group, Inc.,* 16 F.3d at 562 n. 10 (even where stay is specifically required to guarantee preservation of position, absence of stay does not necessarily moot appeal). As stated by another judge of this court,

> There is no general requirement in the Bankruptcy Code that an aggrieved party must obtain a stay pending appeal. *The significance of failing to obtain a stay is that the prevailing party may treat the order as final. In such circumstances actions might occur which cannot be reversed.*

*In re Toc Assocs., L.P.,* 1993 WL 276993 (E.D.Pa.1993) (emphasis added). Furthermore, "a myriad of circumstances can occur that would necessitate the grant of a stay pending appeal in order to preserve a party's position." *In re Highway Truck Drivers & Helpers Local Union # 107,* 888 F.2d at 298.

Thus, appellants' failure to seek a stay does not automatically divest them of their right to appeal confirmation of their rivals' plan. On the other hand, receiving the notice of appeal did not oblige the plan proponents to wait for further court action before moving ahead with reorganization. In fact, they had little choice but to begin taking action once the plan's effective date arrived.

---

**13.** Another judge of this court recently found that, in a single-asset bankruptcy case, relief was possible where it could be "limited to the legal and equitable rights of [the two parties before the court], and need not involve rescinding the sale of property or the transfer of payments to other creditors." *In re River Village Assocs.,* 181 B.R. 795, 801 (E.D.Pa.1995).

Therefore, the risks engendered by the passage of time properly rest with appellants, and the equities at this stage lie with the plan proponents.

### IV. Has the plan been substantially consummated?

■ "Substantial consummation" is a technical term most typically applied in a different context: A plan may be modified after its confirmation only if substantial consummation has not yet occurred. 11 U.S.C.A. § 1127(b) (West 1995). Substantial consummation means:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
> (C) commencement of distribution under the plan.

11 U.S.C.A. § 1101(2) (West 1995). Clearly, the plan proponents have assumed management of all of the property dealt with in the plan and have begun to make distributions under the plan. The only question is whether Debtor has satisfied condition (A), the transfer of substantially all of the property to be transferred. In answer, the court adopts the following reasoning:

> [T]he requirements of subparagraph (A) have been met when all transfers that were to be made at or near the time of confirmation have been completed. Payments on long-term debts ... are not transfers of property within the meaning of subparagraph (A) but are distributions to creditors under subparagraph (C).

In re Burlingame, 123 B.R. 409, 411 (Bankr. N.D.Okla.1991); see also, In re Scotland Guard Servs., Inc., 139 B.R. 264, 265–266 (Bankr.D.P.R.1991); In re Hayball Trucking, Inc., 67 B.R. 681, 683 (Bankr.E.D.Mich. 1986).[14] In brief, "The plan has been substantially consummated. The only act remaining to be performed by the debtor over the remaining term of the plan is to make the cash payments as provided for by the plan." In re Stevenson, 138 B.R. 964, 967 (Bankr.Idaho 1992), aff'd, 148 B.R. 592 (D.Idaho 1992).

### V. What type of relief does the appellant seek on appeal?

"[D]etermining whether an appeal has become moot requires a fact-specific inquiry into the nature of the relief sought, and the effects that relief could have on the overall reorganization plan." In the Matter of Andreuccetti, 975 F.2d 413, 418–19 (7th Cir. 1992). Therefore, a district court may need to determine whether a confirmed reorganization plan constituted an integrated, comprehensive settlement of all claims. In re Texaco Inc., 92 B.R. 38, 47 (S.D.N.Y.1988). "Some claims may not be inescapably bound to the degree of implementation" of the plan. In re AOV Indus., Inc., 792 F.2d 1140, 1148 (D.C.Cir.1986) (claims that attorneys had conflict of interest and that individual creditor should receive payment under special terms were not moot).

Here, however, appellants state, "If this appeal is successful, the Confirmation Order would be reversed. At that point, either a new plan would be submitted which is confirmable or the Debtor will be required to liquidate, as the law provides." (Appellants' Brief at 14). Having reviewed each of the eight issues identified for appeal, the court agrees with appellants that no intermediate relief would be appropriate to the nature of appellants' claims.[15]

14. Appellants rely on In re Heatron, Inc., 34 B.R. 526 (Bankr.W.D.Mo.1983), for an alternative reading of 11 U.S.C.A. § 1101. With three years remaining under a confirmed plan of reorganization, the debtor in Heatron had paid 53% of the total amount due to creditors. The court viewed payments to creditors as part of the property to be transferred under the plan, found that "substantially all of the property" requires more than a mere preponderance, and held that the plan had therefore not been substantially consummat-

ed. However, "[t]he difficulty with the analysis in Heatron is that it makes a nullity of subsection (C)." In re Scotland Guard Servs., Inc., 139 B.R. 264, 266 (Bankr.D.P.R.1991).

15. In their eighth stated issue for appeal, appellants ask this court to review whether the bankruptcy court erred in approving modification of the funding prioritization plan after the completion of the vote. The details of the modification were evidently not central to the plan, and the

*VI. What effect would granting relief have on the interests of third parties not before the court?*

In his affidavit, Berger states:

Eddington has paid all entities, entitled to treatment in accordance with Section 4.3(a) of the Modified Second Amended Plan, cash equal to forty-five percent (45%) of their Allowed Claims in full satisfaction of their claims and these entities have released Eddington from any further claims; and

Eddington has paid all entities, entitled to treatment in accordance with Section 4.3(b) of the Modified Second Amended Plan, cash equal to twenty percent (20%) of their Allowed Claims and these entities have agreed to accept only another fifty percent (50%) of their claims over four (4) years in full satisfaction of their claims.

In other words, Debtor has commenced distributions to all forty-six general unsecured creditors. According to the Report of Plan Voting drafted on February 17, 1995, holders of claims in the aggregate amount of almost $170,000 either elected or were deemed to have elected the first payment option: 45% of the claim's value in cash on the plan's effective date in exchange for a release of all further claims. The court's review of the voting forms themselves reveals that over thirty of forty-six general unsecured creditors chose this option and thus have presumably released all further claims against Eddington Thread. On June 6, 1995, Eddington Thread ostensibly paid over $76,000 to general unsecured creditors who chose payment option (a)—and over $60,000 to those who chose option (b) and who thereby gambled that Debtor will eventually be able to pay 70% of their claims' original value. To overturn the integrated reorganization package would affect these third-party creditors' vested rights.[16]

*VII. Would relief affect the re-emergence of the debtor as a revitalized entity?*

The plan proponents aver, "Any attempt to provide a remedy on appeal would cause irreparable damage to Eddington, the loss of over 100 jobs and the likely liquidation of Eddington with no recovery for most creditors." (Plan Proponents' Brief at 12) The court can only speculate as to how prospective relief would affect Eddington Thread's viability as an on-going concern. However, the court is convinced that Debtor's viability would at least be placed at serious risk. As stated by the United States Court of Appeals for the Fifth Circuit, "That the plan has been consummated and that reversal would affect third parties' rights dictate an affirmative answer to our final inquiry: whether reversal would jeopardize the plan." *In the Matter of Block Shim Dev. Co.–Irving,* 939 F.2d 289, 291 (5th Cir.1991).

*VIII. Conclusion*

The Third Circuit has stated that, in the context of bankruptcy, "a confirmed plan is final." *In re Szostek,* 886 F.2d 1405, 1410 (3rd Cir.1989) (denying creditor's motion to revoke confirmation of a chapter 13 plan of debt adjustment). The Third Circuit recognizes "the importance of maintaining the integrity of confirmed plans from later attack,"

court has no knowledge that the prioritization plan has actually been put into effect. Although appellants' statement of the issue focuses on the use of improper procedures, appellants may in fact be requesting relief that remains within this court's powers.

However, appellants do not have standing to raise this claim. Sylvia Teich is not a creditor. Herman Tannenbaum's ballot, filed in the public record and already subject to inspection by the bankruptcy court, reveals that he did not select a payment plan. Given the size of his claim, he was deemed to have selected a 45% dividend on the plan's effective date as payment in full. Therefore, he cannot be affected by the prioritization schedule. Since they are "unimpaired by those portions of the plan deemed objectionable,

this Court concludes that [appellants] lack standing to challenge" the plan on appeal. *In re B. Cohen & Sons Caterers, Inc.,* 124 B.R. 642, 647 (E.D.Pa.1991).

16. Appellants argue, "[E]ven if it was determined to be too difficult or impractical to recover the monies already distributed, effective relief can still be granted since much of the distributions already make [sic] would be required to be made under any other confirmed plan, or in the event no plan is confirmed upon a liquidation." (Appellants' Brief at 14) The court is not persuaded that, under whatever reorganization or liquidation plan that would emerge, the rights of third parties would be protected.

**906**

*In re Flagstaff Realty Assocs.*, 60 F.3d 1031, 1036 (3rd Cir.1995), and has justified remand of one confirmation plan by noting "unique circumstances." *Id.* (allowing tenant, named in landlord's reorganization plan as unsecured creditor without special rights, to recoup money expended on repairs even though tenant did not challenge or seek stay of reorganization plan). This district's bankruptcy court has specifically held that postconfirmation distributions should be reordered only in "extraordinary situations." *In re B. Cohen & Sons Caterers, Inc.*, 147 B.R. 369, 370 (Bankr.E.D.Pa.1992) (refusing personal injury claimant's demand to administrative expense status, after distributions under plan had already been made to insidercreditors).

■ In the instant case, appellants failed, without explanation, to obtain a stay of the order confirming Debtor's comprehensive reorganization plan. The relief they now request would be difficult to administer, would infringe the rights of innocent creditors not before this court, and would seriously jeopardize the prospects for Eddington Thread's successful reorganization. These factors render the court unable to fashion any appropriate relief under the Bankruptcy Code. Therefore, the case is moot on statutory and prudential grounds. The court's inability to fashion any appropriate relief also means that the court lacks Article III power to reach the merits of this dispute.

The plan proponents' motion to dismiss the appeal of Sylvia Teich and Herman Tannenbaum is granted. The appeal is dismissed as moot.