**In re MAIN, INC., Debtor.**

**Bankruptcy No. 96–19098DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Sept. 17, 1999.

---

Paul B. Maschmeyer, Ciardi, Maschmeyer & Karalis, PC, for Main, Inc.

Mitchell W. Miller, Philadelphia, PA, trustee for Main, Inc.

Eric L. Frank, Philadelphia, PA, General Counsel for trustee Miller.

Steven M. Coren, Philadelphia, PA, Special Counsel for trustee Miller.

Edward J. DiDonato, DiDonato & Winterhalter, P.C., Philadelphia, PA, for Eric J. Blatstein,

Michael H. Kaliner, Fairless Hills, PA, trustee in Blatstein case.

B. Christopher Lee, Philadelphia, PA, for Jacoby Donner and Corporate Entities.

Kevin J. Carey, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, PA, for Lori J. Blatstein.

Mr. Morris Lift, Wyncote, PA, pro se.

Frederic Baker, Philadelphia, PA, Ass't U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

We herein address an issue remanded to this court in one of two separate recent decisions of the District Court ("the Court") in the above-captioned case of MAIN, INC. ("Main") and the related case of Main's principal, Eric J. Blatstein ("Eric"). The Court's Opinion relevant hereto, reported at 1999 WL 330239 (E.D.Pa. May 24, 1999) ("the Opinion"), reversed a portion of our unreported Order dated December 10, 1997 ("the 12/10 Order"), allowing Columbusco, Inc. ("CCO"), another entity controlled by Eric, to pay its counsel, Jacoby Donner, P.C. ("JD"), compensation of not more than $1000 weekly for services performed for it by JD subsequent to the date of the 12/10 Order.

It should not be, but nevertheless is in light of much of JD's arguments on remand, necessary to emphasize that this court must adhere to the Court's mandates regarding the issues at hand, particularly its holding that JD received its compensation imposed with a constructive trust in favor of the Debtor. Following this and the subsequent request of the Court that we address mootness-related issues, we hold that JD has no legislative or equitable insulation in the nature of mootness from being ordered to remedy the reversal of the 12/10 Order by repaying the amounts improperly received. We therefore conclude that JD must repay the Main estate $58,834 of $77,000 received by it pursuant to the 12/10 Order for services which we find did not benefit that estate's interests.

### B. PROCEDURAL AND FACTUAL HISTORY

We will not attempt in any sense to reiterate all of the facts and procedural history of the underlying bankruptcy cases of Main, filed as a Chapter 11 case on September 20, 1996, and converted to Chapter 7 on December 18, 1996, leading to the appointment of Mitchell Miller, Esq. ("Trustee Miller"), as Trustee; and of Eric, filed under Chapter 7 on December 19, 1996, in which Plaintiff Michael Kaliner ("Trustee Kaliner") was appointed as trustee. Rather, we will merely try to relate the most significant decisions which arose out of these cases in the context of what is now before us and refer any interested reader to the Opinions themselves for a more complete picture.

The most significant decision in these cases was *In re Main, Inc.*, 213 B.R. 67 ("*Main II*"), *modified in part*, 1997 WL 626544 (Bankr.E.D.Pa. Oct. 7, 1997) ("*Main III*"), *aff'd in part & rev'd & remanded in part sub nom.*, *In re Blatstein*, 226 B.R. 140 (E.D.Pa.1998) ("*Blatstein II*"), *reinstated as to issues remanded*, 1998 WL 778017 (Bankr.E.D.Pa. Nov. 4, 1998) ("*Main IV*"), *aff'd as to issues remanded sub nom.*, *In re Blatstein*, 1999 WL 689715 (E.D.Pa. Sept. 3, 1999) ("*Blatstein III*"), *Blatstein II*, *aff'd in part and rev'd in part as to issues not remanded*, 192 F.3d 88 (3d Cir.1999) ("*Blatstein IV*"). *Main II* was preceded by the first reported decision arising out of these cases, *In re Main, Inc.*, 207 B.R. 832 (Bankr.E.D.Pa. 1997) ("*Main I*"), *aff'd in part & rev'd in part sub nom.*, *In re Blatstein*, 1997 WL 560119 (E.D.Pa. Aug. 26, 1997) ("*Blatstein I*"), *revised on remand*, *Main III*, at *9–*11, *aff'd*, *Blatstein II*, 226 B.R. at 160–61. On remand of *Main I* in *Main III* we fixed the claim of 718 ARCH STREET ASSOCIATES, LTD. ("Arch"), a creditor whose counsel has been appointed as Trustee Miller's special counsel, against Main at

$582,443.65, applying 11 U.S.C. § 502(b)(6).

Our decisions in *Main II* and *Main III* decided two proceedings commenced by Arch and Trustee Miller in Main's case, and by Arch and Trustee Kaliner in Eric's case, on January 3, 1997, and January 7, 1997, respectively. We concluded therein that Eric (1) had fraudulently transferred his successful bar and restaurant, the Philly Rock Bar & Grill ("Philly Rock"), from Main to CCO to avoid paying Main's creditors, specifically Arch, and was therefore obliged to reconvey Philly Rock to Trustee Miller, 213 B.R. at 78–84; (2) must be denied a discharge under 11 U.S.C. §§ 727(a)(2), (a)(7) on the basis of his primary role in the fraudulent transfer of Philly Rock, *id.* at 83–87; but (3) was not subject to an *alter ego* claim which would have collapsed his many non-debtor entities into one entity in this court, *id.* at 87–93; and (4) was not, with his nondebtor wife, Lori J. Blatstein ("Lori," with Eric, "the Blatsteins"), chargeable with any fraudulent transfers between them. *Id.* at 93–95.

On November 3, 1997, in considering a motion to stay the transfer of Philly Rock from the Blatstein to Trustee Miller pending a number of appeals from the various issues decided in *Main II* and *Main III,* the Court entered an order staying the transfer but directing Eric, CCO, and several other entities controlled to by Eric to remain as constructive trustees and fiduciaries of Philly Rock until further Court order ("the Stay Order").

While these appeals were pending, a proceeding which we described as "a kind of band-aid placed upon a variety of issues either created by, or left unresolved by" the *Main II* proceedings, *In re Main, Inc.* 223 B.R. 457, 461 ("*Main V*"), *supplemented & reconsideration denied,* 1998 WL 601249 (Bankr.E.D.Pa. Sept. 4, 1998) ("*Main VI*"), *aff'd in part & rev'd in part,* 1999 WL 424296 (E.D.Pa. June 23, 1999) ("*Main VII*"), was filed on February 9, 1998. The ultimate decision in this proceeding, which, *inter alia,* awarded Main approximately $800,000 from various Blatstein-controlled entities for unpaid loans but denied relief against the Blatsteins individually, was embodied in *Main V* and *Main VI.* The other recent decision remanding certain matters to us, which will be addressed in a separate Opinion of this court, was *Main VII,* which most notably reversed the decisions regarding the denial of relief against the Blatsteins.

On September 23, 1998, the appeals from *Main II* and *Main III* were considered in *Blatstein II.* That decision remanded the aspect of *Main II* and *Main III* holding that Eric had fraudulently transferred Philly Rock to CCO and denied him a discharge, but affirmed the dismissal of the *alter ego* claims and of the claims of fraudulent transfers among the Blatsteins.

In *Main IV,* we reiterated the decisions, vacated by the Court in *Blatstein II,* that the transfer of Philly Rock was a fraudulent transfer from Main to CCO and that Eric's discharge must be denied for that reason. The Stay Order was deemed by the Court to remain in effect after *Blatstein II* was decided and was intact until the Court's decision in *Blatstein III,* which remanded the proceedings to us only to "implement" the transfer of Philly Rock to Trustee Miller.

The core holdings of *Main II* and *Main III* have therefore been ultimately sustained by the *Blatstein III* and *Blatstein IV* decisions, respectively, both coincidentally decided on September 3, 1999. The avoidance of the transfer of Philly Rock from Main to CCO has been sustained, at least by the Court. The Plaintiffs' *alter ego* claims have failed, per the Court of Appeals in *Blatstein IV.* We do note that the Court of Appeals did hold, in *Blatstein IV,* contrary to our decisions in *Main II* and *Main III,* reiterated in *Main V* and *Main VI,* that Eric's transfers of his income to Lori were avoidable fraudulent conveyances. The practical effect of this

decision is, however, uncertain, as it would appear to support only a "paper" decision in favor of Trustee Kaliner against Lori, who has no apparent assets of her own.

We will now focus on the procedural and factual history surrounding the 12/10 Order, and proceed through a legal discussion which shall decide that issue. On December 4, 1997, Trustee Miller filed a rambling, motion/legal memorandum aimed at preventing certain distributions of Philly Rock funds held in trust by CCO and to compel production of certain documents which CCO had allegedly refused to provide to him ("the December Motion").

The December Motion represented, for the most part, an attempt to enforce the Stay Order. Trustee Miller suspected that, during the period that the Stay Order prevailed, Eric would attempt to utilize the assets of Philly Rock, which he was in danger of losing, to fund his defense of the Trustee's litigation against him and his various entities. By means of the December Motion, Trustee Miller hoped to prevent Eric and CCO from violating their alleged duties as fiduciaries of a construction trust in Trustee Miller's favor through diversion of funds generated by Philly Rock to fund litigation adverse to him. The December Motion averred that the injunction entered in *Main III* to enforce our orders in *Main II* and the Stay Order protected Trustee Miller from such actions, but that Eric and JD were violating the spirit and letter of these orders by funding, with Philly Rock's proceeds, JD's representation of CCO in defending against Trustee Miller's actions. In addition, Trustee Miller specifically contended that Eric and CCO had delayed and obstructed his investigation of Philly Rock's finances by failing to provide him with full access to Philly Rock's financial records despite repeated requests. Trustee Miller therefore attempted to bring the issue of CCO's expenditures before the Court shortly after the Stay Order was entered, as a means of enforcing that Order. How-

ever, the Court directed that the matter to be brought before this court.

When the December Motion came before us, we considered it to be merely a request to impose restrictions on Eric's management of his affairs through a very short period until the Court would decide the appeals from the *Main II* and *Main III* decisions. It was our impression that after this decision, believed to be imminent, we could easily sort out any improper expenditures by the Blatsteins. Therefore, pressed to make an immediate decision, which we expected to be very temporary in duration, we strove to enter an even-handed order, without any briefing or analysis of any potentially applicable legal concepts.

Thus, the 12/10 Order included language which, *inter alia,*

> [r]estrained and enjoined [Eric and CCO] from utilizing the funds, assets or property of Philly Rock and/or [CCO] to pay attorneys, accountants, or others for past services rendered or expenses incurred in connection with or relating to the above-captioned bankruptcy proceedings, any adversary proceedings in connection with such proceedings, and/or any appeals taken or defended in connection therewith.

However, we allowed, as the sole exception to this prohibition, that JD, counsel for all of the Blatstein-controlled nondebtor entities, was to receive compensation of no more than a $1,000 per week from CCO on account of future services performed for CCO. We believed that some exception from the prohibition was necessary to prevent us from hamstringing a nondebtor party, although we also believed that Eric could have funded his defenses from his profitable entities other than Philly Rock.

We also note that we expressly refused to allow any payments by CCO to Blatstein's expert accountant, George Miller, for his accounting oversight services. Accountant Miller protested his "discrimination" vis-a-vis JD in several subsequent motions to obtain a similar dispensation

from this Court, although we ultimately allowed Accountant Miller to be compensated only $5000 for filing tax returns, which order Trustee Miller did not appeal.

We note that, at the hearing resulting in the 12/10 Order, Trustee Miller's special counsel warned, on the record, JD's then-lead attorney, Mary F. Walrath, who ultimately was appointed to the District of Delaware bankruptcy bench ("J. Walrath"), that he would seek to recover from JD any funds paid to that firm since, in his view, the law clearly prohibited the use of these funds to support litigation adverse to the Trustee. We anticipated that, in light of this, the eminent J. Walrath would be extremely careful in avoiding any possible liability of JD in its use of CCO's funds.

Trustee Miller proceeded to appeal only that small portion of the 12/10 Order allowing JD to continue receiving not more than $1000 weekly from CCO. However, at that point, all parties were involved in a flurry of appeals and cross-appeals. No stay of the 12/10 Order was sought from this court or the Court by Trustee Miller.

As it developed, a Court resolution of the issue of the putative fraudulent transfer of Philly Rock to CCO was not, as all parties had anticipated in late 1997, swiftly forthcoming. No decision was rendered at all until *Blatstein II* was issued about a year later and that decision merely remanded the matter to us for further findings rather than resolving it. Only upon the issuance of *Blatstein III*, another year later, was that issue resolved at the district court level.

The ultimate result was an affirmance, which presumably dissolved the Stay Order. However, what it meant is that the 12/10 Order existed as a regulatory directive regarding the Blatsteins' relationship with JD for a much longer time than had been anticipated when it was entered.

When the Court began the task of resolving the several appeals before it arising from our various decisions, it began with the Opinion. That Opinion vacated the 12/10 Order, holding 1999 WL 330239 at *8, that,

> [f]urther factual findings by the bankruptcy court are needed in order to determine whether [CCO] breached its fiduciary duty to the Trustee if it used funds that it held in constructive trust to pay its counsel for activities that were arguably not in the Trustee's interest. Further factual findings are also needed to evaluate whether [JD] were aware that they were being paid with funds that were held in constructive trust for the Trustee, and whether they are therefore obligated to return those payments to the Trustee.

The Opinion, not noting that the 12/10 Order was entered in the context of an immediate, temporary directive, accurately states that, when we entered that Order, we made no factual findings concerning

(1) whether CCO's payments to its attorneys were actually made with constructive trust funds. *Id.* at *5;

(2) Whether the attorneys were paid from other funds CCO possessed that were unrelated to Philly Rock. *Id.;*

(3) Whether the payments to its attorneys were made in the ordinary course of CCO's business or were necessary to operate Philly Rock. *Id.;* and,

(4) Whether the nature of the legal services for which CCO was compensating its attorneys benefitted or protected the assets held in constructive trust. *Id.*

Although it remanded the ultimate resolution of the propriety of the 12/10 Order and the ramifications if it were deemed legally unsupportable to us, the Court issued specific instructions for us to follow on remand. First, it stated that, in the unlikely event that we found that CCO had been using funds other than those generated by Philly Rock, which it held in constructive trust to pay JD, we would have been correct in our prior conclusion

that we had no authority to control those payments as a breach of CCO's fiduciary duty. *Id.* at *7. Next, it stated that, if those payments were indeed constructive trust funds, we must determine whether JD was on notice that CCO's actions in paying it allegedly constituted a breach of its fiduciary duty, in light of, *inter alia,* the warnings given to J. Walrath by Trustee Miller's special counsel at the hearing resulting in the 12/10 Order. *Id.* at *8. Then, it instructed that, if JD were in fact paid with those constructive trust funds, 11 U.S.C. § 549 would not prevent Trustee Miller from recovering those payments under principles of trust law. *Id.,* citing *In re Mushroom Transp. Co.,* 227 B.R. 244, 259 (Bankr.E.D.Pa.1998).

Following the issuance of the Opinion, CCO filed a motion seeking its reconsideration with the Court, arguing that both the Bankruptcy Code and certain principles of equity compelled the Court to vacate its decision and/or to dismiss the appeal as moot. According to CCO's motion, the Court overlooked the significance of the facts that Trustee Miller failed to seek a stay of the 12/10 Order when it filed its appeal and that JD, relying on the 12/10 Order in the long interim, accepted payment for its legal services in reliance on that Order. CCO argued that these two factors brought the transactions authorized by the 12/10 Order within a class of transactions that cannot be equitably and justly undone on appeal. Specifically, CCO and JD argued that any recovery by the Trustee of the amounts already disbursed by CCO to its attorneys should be barred by

(1) 11 U.S.C. § 364(e), which provides that, absent a stay, a reversal on appeal of authorization to obtain or incur debt does not affect the validity of the debt, even if the order authorizing the debt is found on appeal to be erroneous;

(2) the doctrine of equitable mootness, which provides that where an appellant fails to seek a stay of a confir-

mation order and, during the pendency of appeal, events occur that would render appellate reversal inequitable and unjust, the appeal must be dismissed as moot; and,

(3) general equitable principles, which preclude an appellate court from requiring an attorney to disgorge fees for professional services where performance of services and payment of fees was expressly authorized by order of the trial court and the order was not stayed pending appeal.

In response to CCO's motion for reconsideration, the Court entered an order denying the motion in its entirety on August 19, 1999 ("the 8/19 Order"). In so ordering, the Court stated that the motion for reconsideration was an inappropriate vehicle for presenting what it characterized as new arguments which were available when an appeal was briefed, but which were not raised on appeal, citing *Gatto v. MacMillan,* 1996 WL 648859, at *1 (E.D.Pa. Nov. 8, 1996); *West End Associates, L.P. v. Sea Green Equities,* 166 B.R. 572, 573–74 (D.N.J.1994); and *McDowell Oil Service, Inc. v. Interstate Fire & Cas. Co.,* 817 F.Supp. 538, 541 (M.D.Pa.1993). As a result, the Court refused to consider the merits of CCO's mootness and equity arguments.

Nevertheless, the Court stated that, since this court would be making further factual findings on remand concerning whether CCO breached its fiduciary duty to the Trustee and whether JD was aware of that breach, we "might wish to consider" these mootness arguments as well. Accordingly, the Court issued the following additional directives for us to follow on remand:

(1) if we concluded that CCO in fact used constructive trust funds to litigate against the Trustee, then in order to prevail on its contention that this appeal would be moot under 11 U.S.C. § 364(e), CCO would need to convince us that its counsel acted in good faith by accepting pay-

ments from constructive trust funds, citing *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 559 (3rd Cir.1994) (en banc);

(2) at the same time, for CCO to prevail on its claim that 11 U.S.C. § 364(e) renders this appeal moot, we would have to be convinced that no effective relief could be granted to the Trustee, citing, again, *Swedeland, supra*, 16 F.3d at 560–63; and,

(3) if we concluded, on the other hand, that JD was aware that it was receiving constructive trust funds in breach of CCO's fiduciary duty, we may also conclude that effective relief would be possible because state law would provide a basis for the Trustee to recover those payments from JD, citing *West End Associates, supra*, 166 B.R. at 576–77.

On June 2, 1999, upon receipt of the Opinion, we entered an order scheduling a status hearing to determine how we would proceed on remand on June 9, 1999, which was continued at the parties' request until June 16, 1999. After a colloquy at that hearing, we ordered that we would conduct a hearing on the remanded issue on July 21, 1999. J. Walrath, who had been JD lead counsel in these matters until her appointment to the bench on September 9, 1998, was, however, not available to testify until July 28, 1999, and her testimony was heard on the latter date. After the hearing, the parties were accorded the opportunity to simultaneously file briefs in support of their respective positions on or before August 18, 1999.

In his brief, Trustee Miller argued that JD must disgorge to Main's estate $76,550 of $77,000 that it received from CCO pursuant to the 12/10 Order. In support of his argument, the Trustee observed that (1) based on its own submissions, JD conceded that it should return at least $5,231 to the Debtor's estate; (2) virtually all of the legal services provided by JD were adverse to the interests of the Trustee; (3) the fact that the fees in question were

initially authorized by the 12/10 Order has no bearing on JD's obligation to return the monies claimed; and (4) Trustee Miller's special counsel had put J. Walrath on notice at the December 10, 1997, hearing that he considered that CCO's payment of the fees in question was a breach of CCO's fiduciary duty. Therefore, he contended that JD must return the monies claimed.

In opposition, CCO argued (1) the Court's constructive trust analysis was erroneous and should not support an order against it on remand; and (2) J. Walrath had testified that she believed the Court's referral of the issue to this court and the failure of Trustee Miller to seek a stay after our 12/10 Order should be interpreted as his allowing that Order to stand.

Following the 8/19 Order, Trustee Miller asked this court to consider the brief filed by him in opposition to the motion for reconsideration in deciding the mootness and equitable arguments delegated to us by the 8/19 Order. On August 24, 1999, we entered an order granting that motion with the proviso that CCO could also submit the responsive brief in support of its motion for reconsideration to us by August 27, 1999.

In his latter brief Trustee Miller maintains that 11 U.S.C. § 364(e) and the Third Circuit's decision in *Swedeland, supra*, have no bearing on the issues at hand. According to the Trustee, neither the plain language of § 364(e) nor its purpose encompasses the payments made by CCO to JD. Next, the Trustee argued that the December Order should be governed by 11 U.S.C. §§ 330 and 331, not § 364. Finally, he contended that neither the doctrine of equitable mootness nor principles of equity and fairness barred his recovery of the fees in question.

CCO, on the other hand, contended that the Trustee's recovery of JD's fees was barred (1) by 11 U.S.C. § 364(e) and the Third Circuit's decision in *Swedeland, supra*; (2) by the doctrine of equitable mootness; and (3) by general principles of "fairness and equity."

## C. DISCUSSION

1. *CCO Breached Its Fiduciary Duty to Trustee Miller by Using Constructive Trust Funds to Pay JD for Its Participation In Litigation Adverse to the Interests of the Trustee as to All But $18,166 of the $77,000 Funds at Issue.*

CCO stipulated that the funds used to pay JD amounted to $77,000 and were all derived from the operation of the Philly Rock. Trustee Miller argued that virtually all of the legal services provided by JD which were funded in accordance with the 12/10 Order supported activities adverse to the interests of the Trustee and Main's estate. In support of this argument, the Trustee submitted the following Table analyzing the services itemized by JD:

| COLUMBUSCO'S ATTORNEYS (JACOBY DONNER, P.C.) TIME RECORDS | | | |
|---|---|---|---|
| DESCRIPTION OF SERVICE | NUMBER OF HOURS | RESPONSIBLE ATTORNEY | DOLLAR AMOUNT |
| 1. Columbusco document issues | 10.10 | Christopher Lee | $ 2,480.00 |
| 2. Kauffman opinion [Blatstein II] | 38.30 | Christopher Lee | $ 7,037.00 |
| 3. Deer personal injury claim | 1.50 | Christopher Lee | $ 375.00 |
| 4. Transfer of employee | 0.30 | Christopher Lee | $ 75.00 |
| 5. Appellate work for Columbusco | 125.80 | Mary Walrath | $32,708.00 |
| 6. Document production and responses to the Trustee's requests for documents/information | 58.60 | Mary Walrath | $15,236.00 |
| 7. Hearing before Judge Cahn | 21.00 | Mary Walrath | $ 5,460.00 |
| 8. McAleer matter | 13.20 | Mary Walrath | $ 3,432.00 |
| 9. Settlement/mediation | 19.10 | Mary Walrath | $ 4,966.00 |
| TOTAL DOLLAR AMOUNT | | | $71,769.00 |

Trustee Miller argued that the following services constituted activities in litigation against him and therefore were in direct opposition to his interests: (1) Kauffman opinion ($7,037); (2) Appellate work for Columbusco ($32,708); (3) Hearing before Judge Cahn ($5,460); and (4) Settlement/mediation ($4,966) in connection with the litigation. Trustee Miller also contended that it is unrealistic that the estate should be required to pay JD a sum as large as $17,716 in connection with his requests for documents and information directed to CCO. According to the Trustee, our decisions in *Main II* and *Main III* and the Stay Order reciting same should have given him complete access to the books and records requested. Therefore, Trustee Miller contended that there is no convincing rationale to justify the significant amounts allegedly incurred in services related to such requests for documents and information. Also, Trustee Miller asserted that the payments for services in the McAleer matter ($3,432) preceded the 12/10 Order and for this reason were improperly paid by CCO.

There is no question that we are obliged to adhere to the Court's mandate that, as long as the source of the payments was revenue from Philly Rock, to which CCO

stipulated, the payments to JD were imposed with a constructive trust in favor of Main's estate. *See In re Chambers Development Co.*, 148 F.3d 214, 224 (3d Cir. 1998); and *Casey v. Planned Parenthood of Southeastern Pa.*, 14 F.3d 848, 856 (3d Cir.1994). The fact that CCO has chosen to argue the correctness of the Court's rulings to us reveals only that, in light of the Court's directives, it has no defense on that point.

We believe that the only area left open to contest by the Opinion, as to the issue of whether the payments breached a fiduciary duty, was the question of whether specific services performed by JD, as outlined by Trustee Miller's Chart reprinted at page 68 *supra*, may have benefitted rather than have been oppositional to the Trustee's efforts.

The stipulations on the record establish that CCO's payments to its attorneys were actually made with constructive trust funds. In addition, the evidence and testimony submitted on the record shows that

(1) CCO admitted that JD received more payments than the amount to which it was legally entitled. That is, CCO paid $77,000 in fees to JD. However, in their remand brief JD admitted that solely $71,769 was properly compensable;

(2) four out of the nine services provided by JD, the Kauffman opinion, Appellate work for CCO, Hearing before Judge Cahn, and Settlement/mediation services, comprising $50,171 of $71,769, involved areas in which CCO was litigating in direct opposition to the Trustee; and

(3) one of the nine services provided by JD, the McAleer matter involving $3,432, concerned services which predated the 12/10 Order.

■ In light of this evidence on the record, we must conclude that no less than $58,834 of the $77,000 paid by CCO to JD did not benefit or protect the assets of Main which CCO held in constructive trust. Therefore, we can easily conclude, by looking at these facts and numbers on the record, that CCO breached its fiduciary duties and that at least $58,834 of the monies disbursed to JD rightfully belongs to the Trustee.

As to the remaining $18,166, the parties agree that two out of the nine services in question, the personal injury and employee transfer matters, comprising $450 Of the time expended, were beneficial to Main's estate. As to the $17,716 balance, Trustee Miller contends that it is inconceivable that the estate should be required to pay such an excessive amount for document and information requests, especially in light of the decisions which gave him complete access to the materials in question.

We believe that these contentions of Trustee Miller fail for two reasons. First, the document and information requests benefitted and protected the assets held in trust by CCO. That is to say, JD not only facilitated the production of documents and information to the Trustee, but helped his professionals in understanding the documents and information provided. Second, Trustee Miller fails to note in his analysis that the requests at issue covered a seventeen-month period. By way of mathematical analysis, from December 10, 1997, until May 24, 1999, JD could have been paid a $1,000 weekly allowance on account of future services performed for CCO. The amount requested for document preparation, $17,716, computes to only about $233.10 weekly over the applicable seventy-six week period. This sum does not appear excessive. We are therefore prepared to conclude that the $17,716 of the amount paid to JD was expended on Main's behalf. As a result, JD is entitled to retain $17,716 plus the undisputed $450, or $18,166, from the $77,000 received on the basis that these services did benefit Main's estate.

2. *JD Was Unable to Establish that it was Unaware that It Was Utilizing Trust Funds to Compensate It for Its Services.*

We next pass on to determine (1) whether JD was aware that It was being paid

with funds that were held in constructive trust for Trustee Miller; and (2) whether it is therefore obligated to return those payments to the said Trustee. Trustee Miller, of course, contended that JD was on express notice, per the statements of his special counsel to J. Walrath at the December 1997 hearing resulting in the 12/10 Order, that CCO's payment of the fees at issue was a breach of the latter's fiduciary duties and, therefore, JD must return all of the payments which did not benefit Main's estate to the Trustee. To support this contention, Trustee Miller also argued that the fact that the payments in question were initially authorized by the 12/10 Order has no bearing on JD's obligation to return the wrongfully paid monies to him.

CCO, on the other hand, asserted that there were no facts which would support a determination that JD should be required to repay funds that they earned and which were paid pursuant to the 12/10 Order. The warning of the Trustee's special counsel was characterized by CCO as simply one of many threats, which J. Walrath stated that she was compelled to ignore if she wished to properly represent her clients. Basically, CCO maintained that JD relied on the 12/10 Order and had no reason to believe that they were accepting funds improperly paid.

We find that these facts clearly support the position that JD was well aware of the fact that a constructive trust may have been imposed on payments to it by JD. It is true that the Trustee's special counsel definitely did warn J. Walrath that JD could be required to return the fees provided on account of future services performed, if those services resulted in a breach of their fiduciary duties to the Trustee. Whether other threats were made and whether those other threats had any basis, none of which was proven, is largely irrelevant.

What is most telling is the fact that JD was itself representing CCO in the very matters which resulted in the payment of the funds. Therefore, for CCO and JD to claim at this stage of the proceedings that they were not aware that they were being paid with funds held in constructive trust is only to argue that they disagreed with the Trustee's special counsel. Unfortunately, for them, the Court has upheld special counsel's position. This sort of argument by CCO is no sense a defense to a directive that funds not expended for the estate's benefit must be repaid to the estate.

There are particular circumstances present at hand which further weaken JD's position. We had some difficulty considering the matters allocation of payments issue before us on December 10, 1997, to be a matter of great significance because we could not understand why JD's legal fees had to be paid out of CCO's assets, as opposed to those of Blatstein's other entities, especially since the appeals from *Main II* and *Main III* impacted on all of the Blatsteins' entities. It seemed to us the proceeds from other Blatstein entities clearly could have been made to pay JD's fees without objection. We therefore felt that it was somewhat artificial to enter any restriction on CCO's compensation of JD, and we therefore mixed all of these considerations into a balancing test which resulted in the $1,000 weekly limit.

Apparently it was important to CCO or JD or both that JD be paid out of CCO's funds. The motivation for doing may have been to spend Philly Rock assets which might otherwise have been payable to Trustee Miller. Perhaps there were other, purer motives.

However, the fact remains that CCO and JD both chose to have JD paid $77,000 out of CCO's assets. It appears that other choices of payment sources were certainly available. This is especially so in the context of the Blatstein entities, which we find have always operated as a unit, despite our rejection of the *alter ego* theory.

JD, as the Blatsteins' counsel, was uniquely aware of Trustee Miller's position

and his appeal. JD was also uniquely aware, as time went by, that the 12/10 "temporary" Order had been entered without legal analysis, had become semi-permanent, and was now being subjected to rigorous legal analysis. Perhaps it was so confident that the decision that Philly Rock was fraudulently transferred would be reversed, which it appears *would* have mooted the issue, or that the Court would not reverse the 12/10 Order, that it chose to continue to accept funds from CCO. However, it, of all entities, was certainly well-positioned to know and weigh the risks involved. Nevertheless, it continued to accept payments for its services from CCO, at least until the Opinion was filed.

■ As to JD's obligation to return the monies in question, the Court, in the Opinion, 1999 WL 330239, at *8, provides the following legal principles to be followed on remand:

[i]t is a well established principle of trust law that a trust beneficiary may recover trust property transferred to a third party if the transfer was a breach of the trustee's fiduciary duty and the third party had reason to know that the trustee's action was a breach of its duty. *See Struble v. New Jersey Brewery Employees' Welfare Trust Fund*, 732 F.2d 325, 327 (3rd Cir.1984); *Zions First Nat'l Bank v. United Health Club, Inc.*, 704 F.2d 120, 124 (3rd Cir.1983); *In re Estate of Banes*, 452 Pa. 388, 305 A.2d 723, 727–28 (1973); *Columbia Cas. Co. v. County of Westmoreland*, 365 Pa. 271, 74 A.2d 86, 88 (1950); Restatement (Second) of Trusts § 288 ("If the trustee in breach of trust transfers trust property to a person who takes with notice of the breach of trust, the transferee does not hold the property free of the trust, although he paid value for the transfer."), § 295 (permitting recovery against either the trustee or the third party) (1959).

■ The application of these principles to the issue at hand leads unmistakenly to the conclusion that any portion of the fees paid by CCO to JD during the seventeen-month period between December 10, 1997 and May 24, 1999, which is attributable to services which did not benefit Main's estate must be returned to Trustee Miller. Moreover, only by recognizing Trustee Miller's right to make JD return the monies in question could the cost of utilizing estate funds for improper purposes be cured, per the authorities cited by the Court. As we found at pages 68–69 *supra*, $58,834 of the $77,000 paid for services performed to JD neither benefitted Main's estate nor protected the assets held in trust by CCO. Accordingly, JD is required to return the sum of $58,834 to the Main's estate unless its mootness and related equitable arguments direct otherwise.

3. *CCO's Contentions that Trustee Miller's Recovery of the $58,834 Improperly Paid Fees Are Barred by Provisions of the Bankruptcy Code, e.g., 11 U.S.C. § 364(e); the Doctrine of "Equitable Mootness;" or General Principles of "Fairness and Equity" Cannot Be Sustained.*

■ At pages 66–67 *supra*, we quoted the specific directives which the Court stated in the Opinion and the 8/19 Order, respectively, that we should follow in considering the defenses of statutory mootness, equitable mootness, and other general equitable principles in determining the exposure of JD on remand. We begin by considering the potential applicability of provisions of the Bankruptcy Code which limit appealability in certain situations. Though not expressly cited by CCO, we begin by referencing 11 U.S.C. § 363(m), which is the only Code section at issue in *West End Associates, supra*. The applicability of this Code section is, however, limited to situations where a debtor's property is sold or leased by the trustee under 11 U.S.C. § 363(b) or 11 U.S.C. § 363(c). *See* M. Joseph, *The Mootness Doctrine in Bankruptcy*, 7 BANK.DEV.J. 313, 316 (1990). *See, also e.g., Krebs Chrysler-*

*Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 498 (3rd Cir.1998); *In re Long Shot Drilling, Inc.*, 224 B.R. 473, 478 (10th Cir. BAP 1998); and *In re Egbert Development, LLC*, 219 B.R. 903, 907 (10th Cir. BAP 1998) (§ 363(m) applies only to appeals involving transactions under § 363). Accordingly, the purpose of that section is to prevent "collusive bidding" in sales under §§ 363(b) or 363(c). S.REP. NO. 989, 95th Cong., 2d Sess. 57 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5043. Such a purpose is not presented by the instant facts. Therefore, the doctrine behind *West End Associates, supra*, 166 B.R. at 576–77, is inapplicable to the issues at bar.

■ In a similar · fashion, 11 U.S.C. § 364(e), with CCO does expressly invoke, relates strictly to appeals from orders creating liens with preferential position or authorizing debt against the bankruptcy estate under 11 U.S.C. § 364(d). *See Pittsburgh Food & Beverage, Inc. v. Ranallo*, 112 F.3d 645, 648 (3d Cir.1997); and *In re Adams Apple, Inc.*, 829 F.2d 1484, 1488 (9th Cir.1987). *See also*, M. Joseph, *supra*, 7 BANK.DEV.J. at 317. Thus, the purpose of § 364(e) is to assure a post-petition lender, who extends credit in good faith reliance upon a financing order, that it is entitled to the benefit of the order regardless of whether it is later determined to be legally or factually erroneous. *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1355 (7th Cir.1990); *In re Highway Truck Drivers & Helpers Local Union No. 107*, 888 F.2d 293, 297 (3d Cir.1989); and *In re Grand Valley Sport & Marine, Inc.*, 143 B.R. 840, 848 (Bankr.W.D.Mich.1992). *See also*, H. Dixon, J. Spindler, H. Stratta, *Borrowing Agreements*, 531 PLI/Corp 201, 224 (1986).

By its own terms, however, § 364(e) is only applicable if the challenged lien or priority was authorized under § 364(d). H.R.REP. NO. 595, 95th Cong., 1st Sess. 347 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6303. *See also*

*Swedeland, supra*, 16 F.3d at 560–61; *In re Saybrook Manufacturing Co.*, 963 F.2d 1490, 1493 (11th Cir.1992); and C. Tabb, *Lender Preference Clauses and the Destruction of Appealability and Finality: Resolving a Chapter 11 Dilemma*, 50 OHIO ST.L.J. 109, 116–35 (1989). In the instant case, the 12/10 Order was not entered pursuant to § 364(d). Accordingly, § 364(e) is also inapplicable to the issues at bar.

These Code sections hence do not advance CCO's position. CCO appears to argue that the presence of these Code sections, despite their inapplicability, supports a notion that bankruptcy orders are generally moot if not stayed. We believe that in actuality they support a contrary inference, *i.e.*, if a Code section expressly providing that a certain type of order is moot if not stayed pending appeal does not exist, there is no basis to support a mootness argument. Since neither § 364(e), nor § 363(m), nor any other Code section provides or implies statutorily that any other sort of bankruptcy appeal is moot if not stayed, there would appear to be no support for an argument that a bankruptcy appeal not arising under these Code sections is barred by mootness.

There are, however, other mootness concepts which exist in the case of bankruptcy appeals and also exist in common with other appeals. The Code sections precluding certain appeals do not eliminate or weaken these concepts. However, neither does their presence support a general concept that bankruptcy appeals are particularly susceptible to elimination on the grounds of mootness.

■ In *In re Continental Airlines*, 91 F.3d 553 (3d Cir.1996) (en banc), the court discusses the concept of mootness in the context of bankruptcy appeals in depth. Considering first the general concept of mootness "in the constitutional sense, implicating the case or controversy requirement of Article III, § 1. *See, e.g., Preiser v. Newkirk*, 422 U.S. 395, 401–02, 95 S.Ct.

2330, 2334–35, 45 L.Ed.2d 272 (1975)," *id.* at 558, the court states that

> [a]n appeal is not moot "merely because a court cannot restore the parties to the status quo ante. Rather, when a court can fashion 'some form of meaningful relief,' even if it only partially redresses the grievances of the prevailing party, the appeal is not moot." [*Swedeland, supra,* 16 F.3d at 560] (quoting *Church of Scientology* [*v. United States,*] 506 U.S. [9,] 12–14 [113 S.Ct. 447, 121 L.Ed.2d 313 (1992)]) . . . .

■ The *Continental* en banc court also describes "the broader interpretation. of mootness applied in bankruptcy cases, often referred to as "equitable mootness,' " *id.,* which CCO expressly invokes. However, this concept is not really so broad. The *Continental* court described it "as a shortcut for a court's decision that the fait accompli *of a plan confirmation* should preclude further judicial proceedings . . ." *Id.* (emphasis added). When setting forth the factors considered by courts in determining whether to apply the equitable mootness doctrine the *Continental* court includes

> (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.

*Id.* at 560, citing *In re Manges,* 29 F.3d 1034, 1039 (5th Cir.1994); and *In re Public Service Co. of N.H.,* 963 F.2d 469, 471–72 (1st Cir.), *cert. denied,* 506 U.S. 908, 113 S.Ct. 304, 121 L.Ed.2d 226 (1992). *See also In re Grand Union Co.,* 200 B.R. 101, 104–05 (D.Del.1996); and *In re Box Brothers Holding Co.,* 194 B.R. 32, 39 (D.Del. 1996). *Cf. In re Eddington Thread Manufacturing Co.,* 189 B.R. 898, 901–05 (E.D.Pa.1995) (court determines that an appeal from a plan confirmation order is moot without invoking the phrase "equitable mootness").

■ As can be seen from examining the first and fourth factors cited by *Continental, see* page 73 *supra,* the "equitable mootness", doctrine has been confined by that court, whose precedent we must follow, to situations where a party has appealed a bankruptcy order confirming a reorganization plan of the debtor. *See* M. Joseph, *supra,* 7 BANKR.DEV.J. at 320–22. *See, also, e.g., In re AOV Industries, Inc.,* 792 F.2d 1140, 1149 (D.C.Cir.1986); *In re Texaco,* 92 B.R. 38, 46–47 (S.D.N.Y. 1988); and *In re Commodore Corp.,* 86 B.R. 564, 569 (N.D.Ind.1988). The only other situation where courts have applied a similar "equitable mootness" doctrine is in the context of appeals from judicially-approved sales, in situations comparable to these covered by § 363(m). *See* M. Joseph, *supra,* 7 BANKR.DEV.J. at 322–23. *See, also, e.g., In re Onouli–Kona Land Co.,* 846 F.2d 1170, 1171 (9th Cir.1988); and *In re First Mortgage Atrium Building, Ltd.,* 92 B.R. 202, 203 (E.D.Tex.1988). Clearly, neither plan confirmation nor the spectre of a good faith purchaser at a bankruptcy sale are case at issue here. Hence, the doctrine of "equitable mootness" appears inapplicable here.

■ CCO does not, however, confine itself to invocation of Bankruptcy Code provisions and the "equitable mootness" doctrine. Its citation and quotation of *Highway Truck Drivers, supra,* although included in its discussion of "equitable mootness," represents an invocation of constitutional mootness. Constitutional mootness is clearly not applicable here, because redress of Trustee Miller's grievance with the 12/10 Order can be meaningfully remedied by an order compelling JD to disgorge improperly-received funds.

■ CCO also invokes what it terms "principles of fairness and equity," citing *In re Dahlquist,* 751 F.2d 295, 298–300 (8th Cir.1985); and *In re Allegheny Int'l, Inc.,* 117 B.R. 171, 177–78 (W.D.Pa.1990).

These cases involved appeals of compensation awarded to professionals pursuant to 11 U.S.C. § 330(a). Although both discuss the concept that an appeal may be denied because an order of reversal would be inequitable, both courts refuse to apply these principles to render appeals from fee awards under § 330 moot.

However, although Trustee Miller at one point argued that the payments to JD fell within the scope of § 330, we cannot agree. JD was not counsel for a debtor-in-possession and was therefore not obliged to be appointed by the bankruptcy court to receive compensation.

■ However, whether JD was obliged to be appointed or not, it is difficult to understand how the appeal of the Trustee from the 12/10 Order could be deemed moot in the constitutional or any other sense. CCO seems to argue that whenever a lower court enters an order allowing certain payments to be made, the failure to obtain a stay of that order by the party imposing it renders an appeal to correct that order either moot or inequitable. This is not the case. It is only in exceptional circumstances where statutory exemptions are prescribed or where totally innocent third parties have reasonably relied on the finality of an order to their detriment that an order is not subject to remedy by an appeal. The party most directly affected by the 12/10 Order was JD, which, as counsel paid by the funds at issue to defend that very order, was not only aware of all of the legal arguments to the contrary, but was uniquely positioned to respond to those arguments with any applicable retorts. However, the arguments failed, and it must suffer the inevitable consequences of a reversal of the 12/10 Order.

■ As a participant in the process of the entry of the 12/10 Order, this court perhaps understands the psychological reasons why JD believes that its being compelled to disgorge funds to Main's estate at this point is unfair. The 12/10 Order was meant to be a temporary accommodation. It was not entered on the basis of carefully-reasoned legal principles, and included several other provisions which were not appealed and were believed at the time to be a trade-off to support the $1000 weekly limit on CCO's payments to JD.

However, we already observed at pages 70–71 *supra*, that JD, although it had other apparent available options, chose to accept payment out of CCO's putative trust funds. The fact that JD, with its eyes wide open, chose this means of compensation, greatly diminishes the pressure of any claim of extraordinary equities in its favor. To the contrary, as appellees go, the equities in favor of JD's blind reliance on the 12/10 Order are relatively low.

It is therefore difficult for us to find equities in favor of such conduct, which almost seems calculated to take the risk. Now that the seemingly unnecessary risk, well known to it, has been held unsuccessfully taken by JD, at least at the district court level, we are not at all inclined to accord it relief on the basis of any equities in its favor. We will thereafter enter an order compelling JD to repay the $58,834 sum found not expended on Main's behalf to Trustee Miller.

## D. CONCLUSION

For all of the reasons articulated herein, we will proceed to enter an order requiring JD to pay to Trustee Miller $58,834 of the $77,000 total compensation received by it from CCO pursuant to the 12/10 Order which we find to be in violation of the constructive trust established as to these payments on behalf of Main's estate.